2006–NMCA–011

126 P.3d 1200

**In the Matter of the Estate of Alex J. Armijo, deceased,**

**Cecilia REDMAN–TAFOYA, Petitioner–Appellant,**

v.

**Anthony I. ARMIJO, personal representative, Respondent– Appellee.**

**No. 24,902.**

Court of Appeals of New Mexico.

Dec. 5, 2005.

Cassutt, Hays & Friedman, P.A., John P. Hays, Santa Fe, for Appellant.

Simons & Slattery, LLP, Thomas A. Simons, IV, Alexandra Corwin Aguilar, Santa Fe, for Appellee.

## OPINION

SUTIN, J.

{1} The district court held Petitioner Cecilia Redman–Tafoya (Tafoya) was disinherited under a no-contest clause in her father's Last Will and Testament by granting a motion to revoke her inheritance filed by her brother who was the personal representative of the estate. Tafoya appeals the court's ruling. We reverse. We set guidelines in regard to the construction and application of no-contest clauses in an attempt to enhance predictability and encourage testators (and their attorneys) to clearly state actual intent in no-contest clauses.

## BACKGROUND

{2} Following a trial on the merits, the district court in this probate proceeding filed a decision consisting of findings of fact and conclusions of law, and afterward entered its final judgment revoking Tafoya's inheritance. For this opinion, we derive the lengthy factual background principally from the district court's largely uncontested findings of fact.

{3} In July and August 1993, Alex J. Armijo (the deceased), Tafoya's father, signed a family transfer lot split plat and affidavit that created a separately platted Lot 2 at 446 Camino de Las Animas, in Santa Fe, New Mexico. The deceased created Lot 2 for the benefit of Tafoya. The deceased owned Lot 1 and two tracts designated A and B at 444 Camino de Las Animas. The deceased's residence was situated on Lot 1. Lot 1 had the benefit of a fifteen foot wide strip of land to the west, along with a five foot wide ingress, egress, and utility easement on the western edge of Lot 2, which, together, allowed access to Lot 1. The entire twenty feet is referred to in this opinion as "the Easement."

{4} Before he created the family transfer lot split, the deceased had constructed a chain link fence which, it turned out, was situated approximately five feet within the Easement on the western line of Lot 2. After the family transfer lot split, Tafoya in 1994 constructed a house on Lot 2. The contractor who built the house followed the deceased's instructions as to where the house should be placed on Lot 2. As was discovered at a later date, the house and a stucco wall encroached into the Easement by approximately eight inches, along with the chain link fence that deceased had constructed five feet within the Easement. Of the fence, house, and stucco wall encroachments, the fence encroachment became the critical dispute between Tafoya and the deceased's estate, the personal representative of which is Tafoya's brother, Anthony I. Armijo (Armijo).

{5} The deceased executed his Last Will and Testament (the Will) in August 1995. In regard to Tafoya's house and Lot 2, the Will specifically provided:

> It is my express desire that the equal distribution of my proceeds of my Estate shall be done without conflict amongst my children and to insure that this occurs I decree that the land upon which [Tafoya] has built her home is her sole and separate property and shall not be considered for purposes of determining her equal share of the proceeds of my estate.

{6} The deceased died in May 1997. Armijo, named in the Will as the personal representative, was appointed as personal representative of the deceased's estate in an informal probate proceeding. A provision in the Will provided that the personal representative was to "immediately take such ac-

tion as may be necessary to sell my personal residence and the land upon which it sits," (the residence and land are referred to in this opinion as "the Residence"), and, further, that the "proceeds received after the payment of all expenses of sale be divided equally amongst my children." The deceased had six children, all of whom were identified as heirs in the application for informal probate, and determined to be heirs by court order in January 2003. As of his death, the deceased had not deeded Lot 2 to Tafoya.

{7} Another provision in the Will, the one critical to the outcome in the probate proceeding, was a no-contest clause, which read:

If any beneficiary under this Will shall in any manner contest or attack this will or any of its provisions, then in such event, any share or interest in my estate given to such contesting beneficiary under this Will is hereby revoked and shall be disposed of in the same manner provided herein as if such contesting beneficiary had predeceased me.

{8} In 1997 the Residence was appraised at $550,000, and Armijo listed it for sale, soon after which the encroachments were discovered. In September 1998, Armijo co-listed the Residence with a realtor, who was a state senator and former planning commissioner of the City of Santa Fe (the City), in an effort to work with Tafoya and the City on the encroachment issues, and to get the Residence sold. Attempts to get Tafoya to "remove all encroaching fences" and to convey five feet of the Easement to the estate were unsuccessful.

{9} The Residence was in a historic district where many driveways did not conform to the twenty foot width required by the City for driveways and variances were readily available for non-conforming driveways. However, initially the City insisted on a twenty foot wide access easement to the Residence.

{10} The first prospective purchaser of the Residence offered in January 1999 to purchase the Residence for $450,000. After learning that the City required a twenty foot wide access easement to the Residence, the removal of the chain link fence, and possibly removal of a portion of Tafoya's home and stucco wall, before issuing any building permit for development of Lot 1, the purchaser attempted to resolve the encroachment issues, but these efforts were unsuccessful because Tafoya objected to any suggested compromise.

{11} In July 1999, a second prospective purchaser offered to purchase the Residence for $450,000. This purchaser learned from a September 22, 1999, letter of the City fire inspector that the first forty feet of the chain link fence had to be removed to allow a twenty foot wide access to Lot 1 for fire equipment.

{12} In August 1999, Armijo tendered a personal representative's deed to Lot 2 to Tafoya that provided that if Tafoya did not remove the fence, the property would revert to the estate as of September 2, 1999. Shortly after this, Tafoya consulted her attorney, who advised her that Lot 2 was subject to a five foot easement for the benefit of the Residence, that complaints she had made against Armijo as personal representative were not sufficient to have him removed as personal representative, and that Armijo's actions did not constitute a contest of the Will. In early November 1999, Tafoya took the position in discussions with the City and Armijo that for safety reasons she would not remove the chain link fence.

{13} On November 23, 1999, the City attorney's office wrote a letter advising that the City fire inspector's September 22, 1999, letter was "premature or even incorrect." This letter also stated that approval of any development of the Residence may require approval not only from the City fire department but also from the Historic Design Review Section and the Streets Division of the Public Works Department.

{14} Also on November 23, 1999, Armijo, as personal representative, filed a quiet title action against Tafoya based on the City's position requiring a twenty-foot driveway and Tafoya's failure to cooperate in resolving the encroachment issues by informal means. Armijo at the same time executed a personal representative's deed that conveyed Lot 2 to Tafoya, reserving the entire twenty feet of

the Easement and objecting to the encroachments. Tafoya answered the quiet title complaint, asserted a counterclaim for declaratory and injunctive relief, and also added a third party complaint against Armijo individually and as personal representative and against another heir, her sister Raquel Lopez. More specifically, in her third party complaint, and on advice of her counsel, Tafoya asserted a claim for slander (relating to a false police report accusing her and her husband of burglarizing the estate, allegedly filed by Armijo and Raquel Lopez), and she also sought to disinherit Armijo and Lopez for challenging the Will. The third party complaint also asserted tort claims of intentional interference with contractual relations, outrage, and intentional infliction of emotional distress, as well as seeking certain declaratory and injunctive relief, and punitive damages.

{15} In June 2000, the Residence was again appraised, with an appraised value of $450,000. The purchase contract that was in place was terminated in July 2000 because of an impasse based on the City's demand for a full twenty foot access easement and Tafoya's refusal to accommodate this requirement by removing the chain link fence based on her safety concerns. Also in July 2000, a third prospective buyer offered to purchase the property for $480,000 and commenced due diligence.

{16} In September 2000, the City stated that an access of twenty feet was the standard requirement, but that the fire department had discretion to allow an access width of less than twenty feet. Further, in the City's opinion, the fire department "would do so if the structures on Lot 1 had an automatic sprinkler system installed and the access through Lot 2 were improved to make the width wider," suggesting removal of forty feet of the chain link fence running parallel to the house on Lot 2 to accommodate the wider access. Tafoya rejected this offer of compromise by the City. As we understand another offer, the prospective purchaser offered to convey to Tafoya twenty feet of real property from the northern boundary of Lot 1 to the southern boundary of Lot 2 in exchange for removal of the chain link fence

and a $36,000 reduction in the purchase price. Tafoya rejected this offer and this prospective purchaser terminated the offer to purchase the Residence because Tafoya refused to remove the chain link fence despite the City's position that removal of the chain link was required. Also in September 2000, Armijo's attorney proposed to Tafoya that the Easement be reduced to eighteen feet so as to prevent removal of Tafoya's house and stucco wall, but requiring the chain link fence to be moved three feet closer to her house. Tafoya rejected this offer.

{17} In October 2000 and in June 2001, Tafoya's lawyer told Armijo's lawyer that there were indications from the City that it would be receptive to granting a variance. Armijo's lawyer wanted written confirmation from the City. In about July 2001, a fourth prospective purchaser made an offer to purchase the Residence, offering $491,000, and commenced due diligence. In the fall of 2001, the City modified its position and for the first time indicated it would allow a fifteen foot easement.

{18} In the fall and winter of 2001, Armijo attempted to settle all issues with Tafoya by applying for a variance from the City to allow a narrower access width and dismissing the quiet title action. Tafoya rejected this offer. Armijo nevertheless proceeded to file an application for approval of a variance with the City planning commission. In the application, Armijo sought reduction of the Easement from twenty to fifteen feet so as to allow Tafoya to retain her home, stucco wall, and the chain link fence, and also sought to consolidate Tracts A and B into one lot. In September 2001, Tafoya submitted her written concurrence in Armijo's application for a variance.

{19} In early October 2001, the purchaser that had made the $491,000 offer terminated the purchase contract because of Tafoya's refusal to remove the chain link fence, but then in mid-October made another offer to purchase the Residence for $430,000. At the same time, a fifth prospective purchaser made an offer to purchase for $475,000. Armijo accepted this latter offer and the prospective purchaser began due diligence.

{20} In December 2001, the City planning commission considered and approved a variance, with both Armijo and Tafoya present at the hearing. Afterwards, Tafoya was asked to sign the plat which approved both the variance and the lot consolidation (the Variance Plat) but she refused to sign. The City nevertheless directed that the Variance Plat could be recorded without Tafoya's signature. The Variance Plat was then recorded bearing only Armijo's signature on behalf of the estate. On December 31, 2001, the sale of the Residence closed for the purchase price of $475,000. Thereafter, Tafoya requested the planning commission to reconsider its approval of the lot consolidation, and the planning commission, on January 3, 2002, denied the request.

{21} The matter of Tafoya's attempt to seek the removal of Armijo as personal representative appears to have first been raised in a March 7, 2002, letter written by Tafoya to the court in the probate proceeding. This letter, a copy of which is in the record on appeal, contains a reference stating, among other things, "Re: Case No. SF97–152(P) REMOVAL of Antonio I. Armijo ... as Personal Representative[.]" The body of the letter asks the court to hear the referenced matters before the closing of the estate or before Armijo's accounting was approved. This letter was later stricken by the court from the record in the probate proceeding, along with many other documents authored by Tafoya, following a July 2, 2002, hearing. Tafoya next authored a letter to the court dated April 22, 2002, and filed on May 16, 2002, setting out reasons for Armijo's removal. This letter, a copy of which is not in the record on appeal, but which was reviewed by the district court, was also stricken from the record. At the July 2, 2002, hearing, the court appears to have indicated that the factual claims in Tafoya's May 16, 2002, filed letter could be slanderous. The court separately asked the parties to "narrow the issues" and file something like a pretrial report clarifying what was still at issue. Tafoya did not again file a document seeking Armijo's removal.

{22} On November 25, 2002, Armijo executed a quitclaim deed (the quitclaim deed) to Tafoya for all of Lot 2 without any reservations or restrictions with respect to the encroachments or the Easement. The trial of the quiet title action occurred on November 26–27, 2002. The district court entered a judgment on January 23, 2003, ruling that the claims dealing with the ownership of the five foot wide easement across the Tafoya property were moot based on the recording of the Variance Plat, which abandoned that easement, and also based on the quitclaim deed. Tafoya did not actively pursue her attempt to disinherit Armijo and Lopez, and the issue was not litigated at trial; instead, the court dismissed the claim without prejudice, characterizing it as a claim more properly decided by the probate court.

{23} On November 21, 2002, Armijo filed a motion in the probate proceeding to revoke Tafoya's inheritance. Armijo asserted that Tafoya and her husband had conspired to force Armijo to resign as personal representative and to usurp property belonging to the estate in order to benefit their own property. Armijo further asserted that the conspiracy was motivated by Tafoya's desire to take over as personal representative and to take over administration of the estate, to prevent the sale and development of the deceased's property, and to dismiss or fail to pursue various claims of the estate. The motion listed many alleged actions taken by Tafoya and her husband supporting the conspiracy charge and purportedly taken in furtherance of the conspiracy.

{24} The district court held a trial in the probate proceeding on pending issues in July, August, September, and October 2003. The court filed findings of fact and conclusions of law on January 21, 2004. After entering its findings of fact in regard to the history of the Easement dispute which, for the most part, are set out earlier in this opinion, the court found that the quiet title action "continued unnecessarily due to Tafoya's refusal to dismiss her meritless counterclaims and third-party complaint against Armijo and Raquel Lopez." The court also found that between the inception of the probate proceeding and June 1999, the estate's counsel was paid $4,071.15 in legal fees; after June 1999, until February 4, 2003, the es-

tate's counsel was paid approximately $56,568 out of estate funds; and after February 2003, the estate's various counsel were paid $52,540.35 in connection with the personal representative's motion to disinherit Tafoya.

{25} In regard to Armijo's accountings, the court determined that Armijo made regular, thorough, and adequate accountings to the heirs of the estate and properly accounted to the heirs. Further, the court found that the heirs received the accountings and that Tafoya failed to timely object to any of the accountings.

{26} Of the court's sixty-four findings of fact, Tafoya attacks only two of the findings. She attacks the court's finding that her "protestation that her concern with maintaining the chain link fence was for safety reasons was pretextual and not made in good faith." She also attacks the finding that her "refusal to accommodate [the City's twenty foot access] requirement by removing the chain link fence [was] based upon unfounded safety concerns." The basis on which Tafoya attacks these two findings is that they are not supported by substantial evidence in the record as a whole.

{27} The court filed conclusions of law determining that Armijo did not have authority to grant five feet of the Easement to Tafoya or Lot 2 because it would have made the estate property non-conforming, thereby compromising one of the estate's main assets. Further, addressing Armijo's actions, the court concluded that Armijo acted in conformity with the provisions of the Will and New Mexico law. In addition, the court concluded that Tafoya's failure to object to any of the accountings by Armijo until February 2003 constituted a waiver and laches and that she was estopped from asserting "those claims."

{28} Most important for the present appeal, the court concluded the following:

20. Tafoya's claim in the Quiet Title Lawsuit to revoke the inheritance of heirs Armijo and Raquel Lopez constitutes a contest and attack of the Will without probable cause.

21. Separately and independently, Tafoya's efforts to prevent the sale of the Residence constitute a contest and attack of the Will without probable cause.

22. Separately and independently, Tafoya's petition in this action to remove Armijo as Personal representative of the Estate constitutes a contest and attack of the Will without probable cause.

23. Separately and independently, Tafoya's failure to remove the encroachments of her home, stucco wall and chain link fence from the Easement caused the delay of the sale of the Residence, reduced the purchase price and marketability of the Residence and constituted a contest and attack of the Will.

24. Separately and independently, Tafoya's failure to cooperate in the sale of the Residence by refusing to remove the encroachments and rejection of reasonable accommodations caused approximately five (5) legitimate offers to purchase the Residence to be lost.

25. Separately and independently, Tafoya contested and attached [sic—attacked] the Will by filing in this action a letter pleading on May 16, 2002 in which she said "The following is a list of reasons I am respectfully submitting as to why I am filing for the removal of [Armijo] as Personal Representative. Please do not construe this letter or my request for these settings as a contestation of my father's Will, they are no[t]." This was done without probable cause and in violation of her own attorneys' advice.

26. Tafoya's actions constitute a contest and attack of the Will requiring that her inheritance thereunder be revoked and she shall be treated as if she predecease[d] Alex J. Armijo.

The court entered a final judgment granting and approving all of Armijo's petitions for approval of his accountings; granting Armijo's motion to revoke the inheritance of Tafoya and stating that Tafoya would be treated as if she predeceased the deceased for all purposes under the estate and the Will. Tafoya appeals from that judgment. She asserts on appeal that her actions regarding the Easement, to revoke Armijo's and Lopez's

inheritances, and to remove Armijo as personal representative cannot be considered sufficient contests of or sufficient attacks on the Will to support disinheritance.

{29} We think it relatively helpful in tasting the flavor of this extended litigation to note a number of circumstances reflecting Tafoya's demonstrably agitative and contentious attitude during this near five-year saga. Tafoya, who in one of her many letters stated that she had worked with attorneys in New Mexico and elsewhere for twenty-eight years, went through six separate lawyers or law firms. She considered the first four to have been dismissed for "good cause." Further, not including the twenty-one court filed documents authored by Tafoya that were stricken from the probate record, the exhibits in this case contain twenty-three letters that Tafoya personally wrote to the City, Armijo, Armijo's lawyers, and others, dating from 1998 into 2002, several of which are lengthy. She also filed a good number of pro se documents in the two litigations. It is apparent from the record that Armijo considered some of Tafoya's letters to be threatening and slanderous. In October 2002, Tafoya requested the judge in the quiet title action to voluntarily recuse himself for allegedly humiliating her and her husband, implying that she and her husband were liars, ignoring everything they presented to him, denying a request for a continuance, causing Tafoya great stress, and showing that he would not be a fair and impartial judge.

## DISCUSSION

## I. TAFOYA'S CONTENTIONS

### A. TAFOYA'S CONTENTIONS REGARDING THE EASEMENT

{30} In his Will, the deceased directed that his real property be sold and the proceeds be distributed equally. The deceased expressly stated his desire that the equal distribution of proceeds "be done without conflict amongst my children." Presumably anticipating a conflict in regard to whether Tafoya's house and Lot 2 were a part of the estate, the deceased made it clear that Tafoya's house and Lot 2 were not part of the estate, but were Tafoya's sole and separate property. Unfortunately, the deceased did not discuss in the Will whether Tafoya was to own the house and Lot 2 free of the Easement. The district court entered no finding as to the deceased's intent in regard to the Easement and appears to have implicitly determined that the deceased's intent was that Lot 2 remain subject to the Easement.

{31} Although Tafoya breaks her contentions regarding the Easement into three separate discussions, the points are interrelated. She first asserts that the Will contained contradictory provisions and that, as a matter of law, she was seeking to do nothing more than construe conflicting provisions of the Will. *See In re Estate of Miller*, 230 Cal.App.2d 888, 41 Cal.Rptr. 410, 419 (1964) (holding that a beneficiary could not be disinherited under a no-contest clause for seeking a construction of provisions of a will); *see also In re Estate of Strader*, 107 Cal.App.4th 996, 132 Cal.Rptr.2d 649, 655 (2003) (explaining that co-administrators' request for distribution of proceeds from conservatorship litigation was similar to an attempt to characterize property not expressly mentioned in the will and thus was not in violation of the no-contest clause.) Second, she asserts that her actions were taken to protect her own property and, as such, cannot be construed to be an attack on or a contest of the Will permitting disinheritance. *See In re Estate of Watson*, 177 Cal.App.3d 569, 223 Cal.Rptr. 14, 17 (1986) (holding that claims against beneficiaries that arise from independent contractual rights were not prohibited under the no-contest clause and that the claims, if proved, would not thwart the testator's intent); *Fuller v. Fuller*, 217 Ga. 316, 122 S.E.2d 234, 238 (1961) (holding that beneficiary's ejectment action to recover land that had not been devised by the will or its residuary clause was not in violation of the no-contest clause). Third, Tafoya asserts that she had legitimate safety concerns for her property and that the court's findings that her safety concerns were pretextual, not in good faith, and unfounded, were not supported by substantial evidence.

### 1. THE CONTRADICTORY PROVISIONS ASSERTION

{32} Tafoya argues that provisions of the Will are contradictory. She shows that the

Will states Lot 2 was her sole and separate property (and therefore not part of the deceased's estate), yet the deceased had knowingly created the encroachment issues. Thus, she continues, the Will's provision that the Residence be sold immediately created ambiguity. She inquires: "Did he want his encroachments removed, so that Lot 1 could be sold more quickly? Or did he want Mrs. Tafoya's property to remain as he had designed it, and some sort of approval obtained from the City of Santa Fe so that Lot 1 could then be sold with the encroachments in place?" She argues that the Will was silent as to how the deceased wanted the ambiguity resolved and which provision of the Will the deceased wanted to take priority.

{33} Tafoya argues that she and Armijo had different interpretations of the Will and of the deceased's intent, which were nothing more than efforts to construe contradictory provisions, and the quiet title action was simply a formal, legal mechanism to resolve their conflicting views. She points out that the encroachment issues were eventually settled when her view of the deceased's intent was accepted and the City granted the variance pursuant to which she was not required to remove the fence or any portion of her house or stucco wall. Tafoya contends that the district court's determination that she should be disinherited for steadfastly holding her ground on her interpretation of the conflicting provisions was erroneous as a matter of law.

## 2. TAFOYA'S ACTION TO PROTECT HER PROPERTY

{34} Tafoya argues that she had every right to take whatever steps she perceived to be necessary to protect her property without fear of being disinherited under the Will, including resisting agreement to Armijo's demands as though a non-heir third party owned Lot 2 instead of an heir such as Tafoya. She contends that she was acting as the owner of her own separate property, not as an heir. Tafoya further argues that her positions were not unreasonable, given the circumstances. Those circumstances include her view that if the Easement issue had been tried on the merits in the quiet title action,

she might very well have prevailed; the fence and house were placed in the Easement by the deceased, raising an estoppel argument against the estate; and that her persistence eventually paid off because the City ultimately granted the variance that she had sought from the start. For these reasons, Tafoya contends that the court erred in determining that she should be disinherited.

## 3. TAFOYA'S SAFETY CONCERNS

{35} Tafoya argues that her insistence that the encroachments be left in place was motivated by legitimate safety concerns. She feared, based on past experiences, that if the encroaching fence and stucco wall were removed, vehicles might slide down the steep driveway of Lot 1 during icy winter conditions and into her house and gas meters. She points out that City personnel had expressed the same concern and had even cited the concern as one of the reasons for ultimately granting the variance.

{36} Tafoya argues that the only evidence to the contrary was that she allegedly would not agree to a compromise involving the placement of concrete bollards upon removal of the fence. In that regard, she testified at trial that the City would not permit bollards in her property's five foot side yard setback. In sum, Tafoya contends that the district court's findings that her safety concern was pretextual, not in good faith, and unfounded were not supported by substantial evidence.

## B. TAFOYA'S CONTENTIONS AS TO SEEKING FORFEITURES OF ARMIJO'S AND LOPEZ'S INHERITANCES

{37} In her third party complaint in the quiet title action, Tafoya sought a declaration that the interests of Armijo and Lopez under the Will "are forfeited and their interests lapse to the Estate." Tafoya contends that the court's conclusion that she should be disinherited for this pleading was erroneous as a matter of law.

{38} Tafoya's primary argument is that she did not actively pursue her disinheritance claims in the quiet title action, that the parties stipulated in that action that the proper

forum for these disinheritance claims was in the probate proceeding, and that the court ultimately dismissed the disinheritance claims from the quiet title action without prejudice. Further, Tafoya shows that she did not refile any disinheritance claims in the then formal probate proceeding. Thus, Tafoya contends, "[t]his scenario simply does not rise to the level of a will contest for which the drastic remedy of forfeiting [her] interest in the Estate of her father should be invoked." *See Sheffield v. Scott*, 662 S.W.2d 674 (Tex.App.1983) (holding that the mere filing of a petition designed to contest a will did not constitute a will contest because the petition was dismissed and never litigated).

{39} Tafoya also argues that she had probable cause to file her disinheritance claims and did so in good faith. *See In re Seymour*, 93 N.M. 328, 332, 600 P.2d 274, 278 (1979) (holding that although no-contest clauses are valid they cannot be used to disinherit a beneficiary who acts in good faith and with probable cause). She argues that Armijo's and Lopez's actions were inconsistent with the Will's express recognition of her separate and independent ownership of Lot 2 and were in violation of the no-contest clause of the Will. She points to Armijo's aggressive pursuit of his own interpretation of the deceased's intent in the Will; Armijo's attempt to have her accept a deed that would revert her separate property to the estate if the fence were not removed; Armijo's filing of the quiet title action that sought to compel her to remove all (and Tafoya emphasizes "all") of the encroachments and that incorrectly alleged that she had been responsible for creating them; and even Armijo's much later claim that she should be disinherited for her failure to remove the encroachments to enable the immediate sale of the Residence as required under the Will.

## C. TAFOYA'S CONTENTION AS TO SEEKING TO REMOVE ARMIJO AS PERSONAL REPRESENTATIVE

{40} The district court concluded that (1) a "petition" in the probate proceeding to remove Armijo as personal representative, and (2) a "letter pleading" filed on May 16, 2002, stating reasons for the removal of Armijo and asking the court not to construe the letter as a contest of the Will, each constituted a contest of and attack on the Will.

{41} In regard to the letter filed May 16, 2002, Tafoya states that the letter was not introduced in evidence and was, in fact, stricken from the district court file and is not a part of the record on appeal. She acknowledges that the court did view a copy of the letter during Armijo's opening statement at trial, and that she was asked about the letter during cross-examination but on appeal states that the court was not asked to take judicial notice of the letter and did not do so. Tafoya adds that the court was apprised of the fact that the letter had been stricken from the record.

{42} In regard to the "petition," Tafoya states that nothing in the court's findings and conclusions reflects what document constituted the "petition." She asserts that the record does not contain any document filed by her that appears to be a petition or request to the court to remove Armijo. She asserts further that, except perhaps for the May 16, 2002, letter, which appears on the list of pro se pleadings stricken from the record, the list of pro se pleadings stricken from the record does not show any such "petition." At the same time, Tafoya acknowledges that she wrote a March 7, 2002, letter asking that certain captioned matters, including "Removal of Antonio L. Armijo as Personal Representative," be heard before the closing of the estate. She further acknowledges that this March 7, 2002, letter, "was apparently the 'petition' relied upon by the [c]ourt" in its conclusion of law.

{43} In arguing that the March 7, 2002, and May 16, 2002, letters are not a proper basis for the court's disinheritance determinations, Tafoya relies heavily on the facts that no hearing was ever held on removing Armijo and that the two letters were both stricken from the record by agreement of the parties after a hearing before the district court. She further states that the court's expressed purpose was to remove the stricken pro se documents from the court file and place them under seal where they were not open for review by anyone without a court order. Tafoya also grounds her argument on

the fact that, after the documents were stricken from the record, she did not in any way pursue removing Armijo as personal representative.

{44} Further, Tafoya argues that she did not challenge Armijo's appointment as personal representative when he was appointed in 1997, that all she did was challenge Armijo's actions in administering the estate in 2002, and that documents that remained of record indicate that her challenge was supported by probable cause. Tafoya relies on NMSA 1978, § 45-3-611 (1975) for authority that her challenge of Armijo's actions as personal representative was privileged because the statute allows any interested person to petition for removal of the personal representative for cause at any time. She specifically cites Section 45-3-611(B) which describes causes for removal, namely: removal would have been in the best interest of the estate, Armijo mismanaged the estate, and Armijo failed to perform duties pertaining to the office. *See* § 45-3-611(B)(1), (5), (6); *see also In re Miller*, 41 Cal.Rptr. at 419 (holding that an attacking beneficiary could not be disinherited under a no-contest clause for objecting, as permitted under probate law, to an executor's actions); *In re Estate of Wojtalewicz*, 93 Ill.App.3d 1061, 49 Ill.Dec. 564, 418 N.E.2d 418, 420–21 (1981) (holding that challenge to appointment of executor for breach of duty was made in good faith and enforcement of no-contest clause would violate public policy).

## II. ISSUE AND STANDARD OF REVIEW

{45} We address only one issue on appeal, namely, whether any of Tafoya's conduct or actions constituted a contest of the Will. As presented, this case is hardly the cut and dried kind in which a contest is clear. Tafoya's actions and conduct take place on several independent fronts, none on its face an attempt to invalidate or nullify a provision of the Will, although the request to disinherit Armijo and Lopez, if it had been pursued successfully, would have had the effect of revoking those inheritances. Each front is accompanied by an explanation to ward off a claim of contest of a provision of the Will.

{46} A case-by-case evaluation is necessary to decide whether an heir's conduct, including legal actions, constitute a contest of a will. We have set out Tafoya's contentions and authorities in some detail in order to reflect the formidable task presented for any evaluation. In Tafoya's view, hostile conduct and letters cannot be considered a contest. *See* Jack Leavitt, *Scope and Effectiveness of No-Contest Clauses in Last Wills and Testaments,* 15 Hastings L.J. 45, 77–79 (Aug.1963); *see also Lavine v. Shapiro,* 257 F.2d 14, 19 (7th Cir.1958) (holding party seeking accounting from executor not vulnerable to disinheritance based on hostile statements to and opinions of executor). Nor, in Tafoya's view, can her resistance to the Easement in defense of her own property and commensurate refusal to cooperate with Armijo constitute a will contest. *See* Claudia G. Catalano, Annotation, *What Constitutes Contest or Attempt to Defeat Will Within Provision Thereof Forfeiting Share of Contesting Beneficiary,* 3 A.L.R.5th 590, § 22 (2004). Further, in Tafoya's view, because her action to disinherit Armijo and Lopez was taken defensively in the quiet title action and was voluntarily dismissed and not pursued in the probate proceeding, it was not a contest. And her claim seeking to remove Armijo was a permitted statutory procedure, not pursued after her letters were stricken from the record, and therefore was not a contest. *See id.* § 20. Furthermore, she asserts, the mere filing of a motion or claim is not in and of itself a contest of a will. *See Sheffield,* 662 S.W.2d at 676–77.

{47} Tafoya argues that whether her actions were a contest of the Will is a question of law and our review is de novo. Armijo contends that "contest" means "*any* legal proceeding which is designed to result in the thwarting of the testator's wishes as expressed in his will," and that such a proceeding constitutes a contest "[e]ven without a direct challenge to the validity of the will." Based presumably on this definitional will-contest standard, Armijo contends that Tafoya contested the Will by interfering with the sale of the Residence as found by the district court. In regard to this interference-with-sale point, as well as in regard to Tafoya's

attempt to revoke inheritances and attempt to remove him as personal representative, Armijo argues that the appropriate standard of review is a substantial evidence standard. Throughout his answer brief, Armijo discusses evidence to support the district court's findings of fact and argues that the findings support the district court's conclusions of law.

{48} The threshold question we address in this case is what standard of review a court is to apply in ascertaining what constitutes a contest of a will. What the will-contest standard is and whether the district court applied the correct will-contest standard are legal questions and our review is de novo. *See Reed v. State ex rel. Ortiz*, 1997-NMSC-055, ¶ 47, 124 N.M. 129, 947 P.2d 86 ("It is the role of appellate courts to say what the law is and how the law should be applied to specific facts[.]"), *rev'd on other grounds*, 524 U.S. 151, 118 S.Ct. 1860, 141 L.Ed.2d 131 (1998); *see also State v. Duran*, 2005-NMSC-034, ¶ 19, 138 N.M. 414, 120 P.3d 836 ("A reviewing court is not ... bound by a trial court's ruling when predicated upon a mistake of law." (internal quotation marks and citation omitted)); *Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000-NMSC-033, ¶ 7, 129 N.M. 698, 12 P.3d 960 ("We review de novo the trial court's application of the law to the facts in arriving at its legal conclusions.").

### III. NO-CONTEST CLAUSES IN NEW MEXICO

{49} No-contest clause law in New Mexico is sparse, but years back, in 1979, our Supreme Court set such clauses on solid footing. The Court ruled that "no-contest provisions are valid and enforceable in New Mexico, but they are not effective to disinherit a beneficiary who has contested a will in good faith and with probable cause to believe that the will was invalid." *In re Estate of Seymour*, 93 N.M. 328, 332, 600 P.2d 274, 278 (1979). In 1995, considering a no-contest clause to be a penalty, our Legislature rendered no-contest provisions unen-

forceable against a person having probable cause to contest a will. The applicable statute reads:

A provision in a governing instrument purporting to penalize an interested person for contesting a governing instrument or instituting other proceedings relating to a governing instrument or an estate is unenforceable if probable cause exists for instituting proceedings.

NMSA 1978, § 45-2-517 (1995). This Probate Code section is based on Section 2-517 of the Uniform Probate Code. *See* Unif. Probate Code § 2-517 (1990); *see also Restatement (Third) of Property: Wills and Other Donative Transfers* § 8.5 reporter's note 2 (2003) (listing New Mexico as one of fifteen states that enacted a statute based on Section 3-905 [1] of the Uniform Probate Code which reads: "A provision in a will purporting to penalize any interested person for contesting the will or instituting other proceedings relating to the estate is unenforceable if probable cause exists for instituting proceedings.").

{50} We note, too, that the *Restatement (Third) of Property* § 8.5, reads:

### No-Contest Clauses

A provision in a donative document purporting to rescind a donative transfer to, or a fiduciary appointment of, any person who institutes a proceeding challenging the validity of all or part of the donative document is enforceable unless probable cause existed for instituting the proceeding.

It is notable that this section is limited to challenges of the validity of a donative document. *See* § 8.5 cmt. a. Grounds to contest a will include incapacity, undue influence, duress, fraud, forgery, and other grounds leading to invalidity of the document or a part of the document. *Id.* Also of note is that Section 45-2-517 and the *Restatement (Third) of Property* § 8.5 contemplate, for their application, the institution of a proceeding relating to a will.

{51} The action in *In re Seymour* constituted the institution of a proceeding, as con-

---

1. Section 2-517 of the Uniform Probate Code "replicates Section 3-905" of the Uniform Probate Code. *See* § 2-517 cmt.

templated in the *Restatement (Third) of Property*. The Court in *In re Seymour* ruled against disinheritance if the person contesting the will acted "in good faith and with probable cause to believe that the will was invalid." 93 N.M. at 332, 600 P.2d at 278. This ruling was predicated on the fact that the contesting son sought to preclude the admission of the will to probate because a provision in the will was invalid under a statute. *Id.* at 330, 600 P.2d at 276. The case before us differs significantly in that Tafoya did not seek to preclude admission of the Will to probate, nor did she outright seek to invalidate the Will or to invalidate any provision of the Will. Further, the district court determined that Tafoya's conduct and actions hindering the sale of the Residence constituted a contest of the Will, even though the court's determination was not based on any institution of proceedings in relation to the Easement or the Residence.

{52} The ironic aspect of the law as it was stated in *In re Seymour*, if extended beyond attacks on the validity of a will or on a provision of a will, is that a no-contest clause can as easily spur extended and costly litigation as prevent it. Any number of different factual and legal scenarios can develop under which a beneficiary may feel compelled to resist or question actions taken by the personal representative, to seek removal of the personal representative, to seek a clarification of a provision in the will, or, as a will that contains a no-contest clause obviously permits, to seek to enforce the no-contest clause. It would not be unusual in many of these scenarios for persons having an interest in the probate of a will and the administration of the estate to disagree on whether the beneficiary's conduct and actions come within the language of a no-contest clause. Thus, extended litigation ensues, leaving it for a court to attempt to determine whether the testator intended to punish the particular conduct and actions of the beneficiary through the no-contest clause and whether the beneficiary's conduct and actions were justified under a good faith/probable cause standard. The case now before us exemplifies this.

## IV. WILL CONSTRUCTION GENERALLY

{53} No-contest clauses are, generally, strictly construed. *See, e.g., Saier v. Saier*, 366 Mich. 515, 115 N.W.2d 279, 281–82 (1962) (indicating it to be a general rule of construction that no-contest provisions in wills, being forfeiture provisions, are to be strictly construed); *see also* Leavitt, *supra*, at 72 ("What can freely be said is that a no-contest clause is construed strictly against forfeiture and reasonably in favor of the beneficiary."); *Restatement (Third) of Property* § 8.5 cmt. d ("No-contest clauses are construed narrowly, consistent with their terms."); Catalano, *supra*, § 2[a] ("While it is true that a forfeiture clause is to be strictly construed, the courts, in interpreting no-contest clauses, recognize the paramount rule in the construction of wills that the ascertainment and effectuation of the testator's intention is controlling.").

{54} What a "contest" is varies. For example, some cases give "contest" a technical meaning as a term of art used by attorneys, limiting it to mean a legal action that involves a trial of factual and legal issues and that seeks to invalidate a will on grounds of lack of testamentary capacity, fraud, undue influence, improper execution, forgery, or subsequent revocation by a later document. *See* Leavitt, *supra*, at 76–77. Other cases broaden the meaning of "contest" to include any "attack on the validity of a material part of [a] will which, if successful, would destroy the integrity of the plan adopted by the testator for the distribution of his estate." Leavitt, *supra*, at 77. Still others resolve the meaning of contest by admitting extrinsic evidence and evaluating whether a beneficiary's action thwarts the testator's intent in regard to specific provisions of the will. *See* Leavitt, *supra*, at 77–78.

{55} In New Mexico, *In re Seymour* provides the following guidance in regard to contests:

No-contest provisions are valuable will devices. They serve to protect estates from costly and time-consuming litigation and they tend to minimize family bickering over the competence and capacity of testators, and the various amounts bequeathed.

However, the function of the court is to effect the testator's intent to the greatest extent possible within the bounds of the law. To strictly construe no-contest provisions in the face of obvious indications of unresolved legal questions, such as were present in this case, could result in complete destruction of a testator's intent.

93 N.M. at 332, 600 P.2d at 278. Consistent, we think, with this statement in *In re Seymour*, is the view that "[w]hether there has been a 'contest' within the meaning of a particular no-contest clause depends upon the circumstances of the particular case and the language used." *In re Watson*, 223 Cal. Rptr. at 16. As well, "[m]uch depends upon the phrasing and reach of the *in terrorem* clause even though such clauses must be strictly construed." *In re Miller*, 41 Cal. Rptr. at 417. Our task is to attempt to develop reasonably fair and useful guidance for construction of no-contest clauses and for resolution of will contests in New Mexico.

## V. WILL–CONTEST STANDARD TO BE APPLIED TO A NO–CONTEST CLAUSE

{56} It is apparent that, in the district court's view, Tafoya "skated . . . over the precipice of forfeiture." *Saier*, 115 N.W.2d at 284. One might characterize the circumstances as the court in *Saier* did: "By his continuously litigious and visibly spiteful conduct appellant must have so irritated and exasperated all concerned with the estate—judges included—as to convince them that he did, by such conduct, contest or attempt to contest his mother's will." *Id.* (holding nevertheless that the district court erred in concluding that the appellant contested the will). Presumably looking at language in the Will in regard to the deceased's direction to sell the Residence, at the no-contest clause language regarding contesting or attacking any provision in the Will in any manner, and at what the court thought were costly consequences from Tafoya's conduct and actions, the court concluded that Tafoya's conduct and actions in regard to the Easement and the encroachments and preventing the sale of the Residence, as well as the legal proceedings to disinherit and remove, constituted separate contests of the Will. In interpreting

and enforcing the no-contest clause, the district court construed the no-contest clause broadly as prohibiting essentially any hostile act and uncooperative conduct having the effect of frustrating Armijo's duty to sell the Residence as mandated in the Will and causing the estate's asset value to dwindle. In our view the no-contest clause in the Will should not be read so expansively and must be read narrowly.

{57} The district court's approach to construction of the no-contest clause language is too all-encompassing. A less expansive reach is required. We adopt a more limited approach, believing that, to the extent possible, this Court should provide guidelines to the probate and estate bar for advising testators and writing no-contest clauses in wills, and guidelines for district courts in deciding disinheritance claims. The broader the reach, the less the predictability. Predictability and clarity of intent are important goals that inform our approach.

{58} Our will-contest approach is meant, then, to encourage clarity of intent and to enhance predictability. The approach is simple and, we hope, clear. No-contest clauses are to be construed narrowly and cautiously. Broad contest or attack proscriptions such as that in the present case should be read as penalizing only beneficiaries who, in the absence of good faith and probable cause, seek through a legal proceeding to invalidate a will or to invalidate a provision of a will on grounds such as lack of testamentary capacity, fraud, undue influence, improper execution, forgery, or subsequent revocation by later document, or on grounds that effectively nullify a material provision in the will. *See id.* at 282 (pointing out that a testator can by appropriate language direct forfeiture of a legacy of a beneficiary who "by indirection, seeks to harass or frustrate his will," or who "by litigation or in any other way might interfere with or impede the administration of her estate, or . . . annoy or nettle unto total distraction any party concerned with her estate"); *cf. Berlangieri v. Running Elk Corp.*, 2003–NMSC–024, ¶ 33, 134 N.M. 341, 76 P.3d 1098 (adopting "a standard . . . for the strict construction of liability releases that requires such clarity that a person with-

out legal training can understand the agreement he or she has made").

{59} This will-contest approach promotes important policies. First, it significantly enhances predictability by herding no-contest clause litigation into a limited arena expandable only by contra-indications clearly and specifically expressed by the testator in the will. Legal proceedings to invalidate a will or to invalidate or nullify a provision in a will are more easily recognizable than other conduct or actions that might be perceived as thwarting some less clear or unexpressed intent of the testator that must be ascertained, if at all, from extrinsic evidence. *See Fuller*, 122 S.E.2d at 237–38 (interpreting clause disinheriting beneficiaries who "contest the validity of the will or institute any proceedings to contest the validity of the same, or any provision therein," to apply to ejectment action designed to invalidate a gift set out in a provision in the will (internal quotation marks omitted)). Words employed by lawyers in wills should "be given their accustomed technical meaning according to common legal usage thereof" in the absence of a contrary intent. *Saier*, 115 N.W.2d at 283; *see* Leavitt, *supra*, at 76–77. Under this will-contest approach there exists a defined arena and the district court or jury has little wiggle room in determining whether a contest exists. The antidote is a different, clear, and specifically expressed intent in the will. Different, limited proscriptions in a no-contest clause specifically describing conduct intended by the testator to trigger disinheritance can be enforced. The prescription and antidote each serves the policy behind no-contest clauses of attempting to lessen the waste of estate assets on litigation. By contrast, the expansive nature of a broad and relatively unlimited standard creates an evaluative parade ground open for unending factual allegations of conduct and actions that allegedly thwart something set out in the testator's will.

{60} Second, this will-contest approach should discourage strike suits to throw a will out, yet because of the good faith/probable cause element, it allows a litigating beneficiary access to the courts to prevent the probate of wills or enforcement of provisions in wills that are invalid under the law. Further, when what can be considered a contest is limited, administration of estates should be substantially less bogged down with good faith/probable cause issue litigation. Extensive good faith/probable cause litigation in regard to issues surrounding a beneficiary's hostility, resistance, lack of cooperation, attack on a personal representative's duties, or invocation of a no-contest clause in the will shifts the focus away from the rationale underlying the good faith/probable cause requirement. The focus, as exemplified in *In re Seymour*, is to provide a mechanism to weed out wills that have no validity in law, while also weeding out nullification strike suits having no good faith/probable cause basis.

{61} Third, our approach comports fully with *In re Seymour*. The will in question in *In re Seymour* was executed by Lois Faye Seymour. 93 N.M. at 330–31, 600 P.2d at 276–77. The wording of the no-contest clause in her will was that if either of the two beneficiaries, a son and a stepson, "shall contest the terms and provisions of this Will, making claim that he is entitled to a greater share of my estate than is provided herein, or contesting in any way the terms and provisions hereof, then I direct that said son shall be disinherited." *Id.* at 330, 600 P.2d at 276. After Seymour executed her will, she divorced her then husband and died two years later. *Id.* The son objected to admission of the will to probate on the ground that the will should be considered revoked on the date of divorce by operation of a statute that was in existence on the date of the divorce and that did not permit the disposition of the estate set out in the will. *Id.*

{62} The Court in *In re Seymour* determined that the circumstances between the time of execution and the time of probate of the will were "sufficiently changed to justify [the contesting son] in seeking a judicial determination construing its meaning and effect." *Id.* at 332, 600 P.2d at 278. The Court addressed the application of new probate code provisions, in effect at the time of the testator's death, to a will which was executed under an older law. *Id.* at 331, 600 P.2d at 277. The Court held that the new

provisions, rather than provisions effective at the time of execution of the will, controlled the estate disposition issue. *Id.* The son's legal proceeding was decidedly an attack on the validity of a material provision of the will and therefore a contest of the will. The question before the Court in *In re Seymour* was whether the no-contest clause should be enforced.

{63} The analysis in *In re Seymour* therefore centered on whether the beneficiary could avoid forfeiture if he acted in good faith and with probable cause to believe that the will was invalid. The Court's goal was to assure that in construing a no-contest clause, it did not completely destroy the testator's intent. *Id.* at 332, 600 P.2d at 278. In construing the no-contest clause in the context of the beneficiary's attack on the validity of the will, the Court in *In re Seymour* refused to ignore the fact that a legitimate unresolved legal question complicated the issue and determined that the attacking beneficiary's good faith and underlying probable cause were essential ingredients in deciding whether to enforce the no-contest clause. *Id.* The Court held that the legitimate unresolved legal question as to which statute applied constituted grounds to refuse to enforce the no-contest clause. *Id.* Because the Court in *In re Seymour* assumed the son's claim was a will contest, its holding does not preclude our approach to will contests.

■ {64} Applying our approach to the no-contest clause in the Will, and rejecting the broad will-contest standard implicitly employed by the district court in the present case, we determine that none of Tafoya's conduct or actions can be considered a contest or attack under the no-contest clause in the Will. None seeks to invalidate the Will or to invalidate or nullify a provision of the Will. Tafoya's conduct and actions comprising resistance and lack of cooperation, even with hostility and opinion mixed in, cannot be characterized as attacking the validity of the Will or as seeking to nullify a material provision in the Will. Moreover, her lack of cooperation with and resistance to Armijo's desire or even duty to sell the Residence with the Easement intact were not activated by her own institution of a legal proceeding. That Tafoya was exasperatingly defiant, her defiance exacerbated in part, it should be noted, by Armijo's threatened forfeiture and by the filing of his quiet title action, does not transform her conduct into the institution of legal proceedings.

{65} Further, Tafoya's disinheritance and removal claims were authorized actions under the Will or by statute. The pursuit of the disinheritance claim under the Will's no-contest clause and of the removal claim under Section 45-3-611 are therefore to be characterized not as attacks on the validity of the Will or of a provision of the Will, but as legal actions under a valid Will with valid provisions to enforce rights granted expressly by statute (removal as a procedure to regulate the administration of an estate) and impliedly under the Will (no-contest clause as a procedure to penalize a beneficiary). Moreover, Tafoya's disinheritance claim and removal request never approached adjudication. They were never pursued after they were first raised. We hold that Tafoya's short-lived and untested disinheritance claim and her removal request do not constitute contests.

{66} We realize that testators may want only to say something general and simple in their wills that will be effective to discourage litigation by or between beneficiaries so as to prevent waste of the assets of the estate and squabbling among beneficiaries. That appears to have been the deceased's approach in the present case. The intent is noble, but in reality it can create ambiguity and complex issues arising from actions and strategies of beneficiaries to avoid disinheritance. Further, it can require a disposition different than that appearing on the face of the will, causing substantial expense and delay, and fostering more distrust and rage. The present case is a good example.

{67} We are fully aware that broad no-contest clauses such as that in the present case can serve as a signal to beneficiaries that opposition in any form may be too great a risk to take, thereby having the effect of warding off will-contest litigation. We are also fully aware that clauses limiting and clearly describing conduct triggering disinheritance can nevertheless to some degree be

unclear, ambiguous, or not as specific as a court would like. There exist no assurances that our will-contest approach will provide a solid pathway to family harmony. This is an arena of unsettled ground. The question is how best to walk it.

{68} A narrow standard for construction of no-contest clauses tells testators and their attorneys how a no-contest clause will be construed absent a different, clear, and specifically expressed intention in the clause that broadens the application of it. Under the course we set in this opinion, testators who are not satisfied with that approach will be required to think through what it is they want to accomplish by a no-contest clause and to clearly and specifically express that different intent in the will. A testator is still free to disinherit beneficiaries on any ground that does not violate public policy and that clearly and specifically expresses what type of legal proceedings, or what type of other conduct and actions, the testator intends to discourage through the threat of disinheritance.

{69} We acknowledge that the wording of the no-contest clause in the Will in question might be read to apply to a disgruntled beneficiary who, for example, is upset because he is getting less than he expected or because another beneficiary is getting a larger gift than deserved, and who acts to obtain better treatment. We also acknowledge that often testators intend to penalize such a disgruntled beneficiary. Nevertheless, for the purposes of lessening waste of estate resources and of promoting greater clarity of intent and predictability as to no-contest clause forfeitures, we think that our default construction for relatively general no-contest clause language such as that in the present case should be the strict, narrow construction we have adopted here. Further, we believe that any broader or different construction or application must be based on a clear and specifically expressed intent set out in the will. Testators and attorneys must carefully communicate with respect to the testator's intentions and they must clearly and specifically express those intentions.

## CONCLUSION

{70} We reverse the order and judgment of the district court granting Armijo's motion to revoke Tafoya's inheritance.

{71} **IT IS SO ORDERED.**

BUSTAMANTE, C.J. and FRY, J., concur.