[No. B199998. Second Dist., Div. One. Mar. 12, 2009.]

CYNTHIA GIAMMARRUSCO, Plaintiff and Respondent, v.
MARK SIMON, Defendant and Appellant.

## Counsel

Greenberg Glusker Fields Claman & Machtinger and Michael A. Greene for Defendant and Appellant.

Sacks, Glazier, Franklin & Lodise, Terrence M. Franklin, Matthew W. McMurtrey; Hoffman, Sabban & Watenmaker and Kenneth S. Wolf for Plaintiff and Respondent.

## Opinion

**MALLANO, P. J.**—In this probate case, a trust provided that the surviving trustor could exercise a limited power of appointment over specified property in three ways: (1) "by a Will . . . duly admitted to probate," (2) "by a . . . Codicil duly admitted to probate," or (3) "by a written acknowledged instrument delivered to the Trustee." The trust then stated, "[i]f no Will *or* Codicil purporting to be that of the Survivor is filed for probate within sixty (60) days of his or her death, it shall be *conclusively presumed* that the Survivor did *not* exercise this limited power of appointment." (Italics added.)

The survivor attempted to appoint the entirety of the subject property by delivering an acknowledged instrument to the trustee, intending to give the property primarily to her daughter and grandchildren. After the survivor's death, no will or codicil was filed for probate within 60 days, raising the question of whether the conclusive presumption provision renders the acknowledged instrument ineffective and giving rise to this litigation.

The daughter intends to argue at trial that the ambiguous language of the limited power of appointment may be reformed or interpreted to give effect to the acknowledged instrument notwithstanding the conclusive presumption. She applied for declaratory relief, requesting a declaration that this argument would not violate the trust's no contest clauses, which disinherit a beneficiary who seeks to nullify a provision of the trust. The survivor's stepson, also a beneficiary under the trust, opposed the application, asserting that the daughter's argument, if successful, would nullify the conclusive presumption provision. The trial court granted the application. The stepson appealed.

We affirm for two independent reasons. First, the daughter relies on other provisions of the trust and extrinsic evidence, contending that the ambiguous language is the result of a scrivener's error. If she prevails on this theory, the trial court may reform the ambiguous language to implement the trustors' intent. Second, the trial court may excuse compliance with the conclusive presumption provision—the condition that a will or codicil be filed within 60

days of the survivor's death—if the survivor exercised the limited power of appointment in a way that approximated the manner prescribed by the trust and that did not defeat a significant purpose of the trustors. (See Prob. Code, §§ 630–632; all statutory references are to that code unless otherwise indicated.)

# I

## BACKGROUND

The following allegations, facts, and evidence are taken from the papers filed in connection with the daughter's application for declaratory relief, our prior unpublished opinion in this case (*Simon v. Giammarrusco* (May 30, 2006, B181504) (*Simon*)), and the record in *Simon*.

Howard Olesky and Maxine Olesky, as trustors and trustees, created The Olesky Family Trust—1983 (Family Trust) on or about February 27, 1984. They restated or amended the Family Trust several times. Howard died on October 20, 1996. Maxine died on November 9, 2003.

Plaintiff, Cynthia Giammarrusco, is Howard and Maxine's daughter. Mark Simon, defendant, is Howard's son by a prior marriage.

"The Family Trust provided that upon the death of the first trustor—Howard—the trust was to be divided into three shares: (1) a decedent's trust, containing the maximum amount that could be placed in a trust not qualifying for the marital deduction without requiring payment of federal estate taxes; (2) a marital trust, containing assets qualifying for the marital deduction; and (3) a survivor's trust, containing the survivor's—[Maxine's]—share of the community property and any portion of the decedent's share of the community property not allocated to the decedent's trust or the marital trust. The decedent's trust and marital trust would [become] irrevocable [upon Howard's death], but the survivor would have power of revocation or appointment over the survivor's trust." (*Simon, supra,* B181504.) The survivor's trust would become irrevocable upon Maxine's death to the extent it held any assets she had not appointed.

As amended by Howard and Maxine in October 1990 and December 1991, the Family Trust stated that upon Howard's death, Mark would receive $200,000 and Mark's children would each receive $100,000. If Howard were the first trustor to die (the decedent), these gifts would be made from the decedent's trust; if Howard were the survivor, the gifts would come from the survivor's trust.

In addition, the Family Trust, as amended in October 1990, set forth the actions the survivor could take. During his or her lifetime, the survivor had a "general" power of appointment—the power to dispose of property—in the survivor's trust and a "limited" power of appointment over property in the decedent's and the marital trust. A power of appointment is "general" if it is exercisable "in favor of anyone at all, including oneself or one's own estate." (Black's Law Dict. (8th ed. 2004) p. 1209, col. 2; see § 611, subd. (a).) If a power of appointment is not "general," it is "limited." (See *Cory v. Ward* (1980) 106 Cal.App.3d 631, 638 [165 Cal.Rptr. 330]; § 611, subd. (d).) A limited power of appointment is exercisable only in favor of "the person or class specified in the instrument creating the power." (Black's Law Dict., *supra*, at p. 1209, col. 2.) Under the Family Trust, the survivor's general and limited powers of appointment, respectively, were described as follows.

"1. Distribution of Survivor's Trust. Upon the death of the Survivor, the Trustee shall distribute the balance then remaining, if any, of the Survivor's Trust (including any undistributed income) to such one or more *persons and entities*, on such terms and conditions, either outright or in trust, *as the Survivor may appoint*. This power of appointment may be exercised only by a Will *or* Codicil duly admitted to probate, *or* by a written, acknowledged instrument delivered to the Trustee, which Will, Codicil or written, acknowledged instrument expressly refers to and exercises this power of appointment; and such Will, Codicil or written, acknowledged instrument may be executed before or after the death of the Decedent. *If no Will or Codicil purporting to be that of the Survivor is filed for probate within sixty (60) days of his or her death, **and if no written, acknowledged instrument is filed with the Trustee prior to the end of such period**, then it shall be conclusively presumed that the Survivor did not exercise this power of appointment. . . .*

"2. Distribution of Decedent's and Marital Trusts.

"(a) Upon the death of the Survivor, the Trustee shall distribute to his or her estate all of the then accrued and undistributed income of the Marital Trust, and shall add the balance of the Marital Trust to the Decedent's Trust, to be held, administered and distributed as a part of that trust, as set forth below.

"(b) Limited Power of Appointment. The Trustee shall distribute all or any part of the Decedent's Trust to such one or more *of the Trustors' issue*, and on such terms and conditions, either outright or in trust, *as the Survivor may appoint*. This *limited* power of appointment may be exercised only by a Will *or* Codicil duly admitted to probate *or* by a written acknowledged instrument delivered to the Trustee, which Will, Codicil or written acknowledged instrument expressly refers to and exercises this limited power of appointment. *If no Will or Codicil purporting to be that of the Survivor is filed for*

*probate within sixty (60) days of his or her death, it shall be conclusively presumed that the Survivor did not exercise this limited power of appointment.* The Survivor may appoint more to some beneficiaries than others, or to the exclusion of others." (Italics & boldface added.)

The lack of symmetry between the conclusive presumption provisions in the general and limited powers of appointment—the language that appears only in the former ("and if no written, acknowledged instrument is filed with the Trustee prior to the end of such period")—is at the heart of the dispute in this case. If that language also appeared in the conclusive presumption provision for the limited power, there would be no basis for this litigation.

Upon Howard's death in 1996, the decedent's trust was not funded because Howard had used his "unified credit" during his lifetime. Two marital trusts—an exempt marital trust and a nonexempt marital trust—and the survivor's trust were created. (See *Simon, supra,* B181504.) For clarity, we will refer to the decedent's trust and the two marital trusts as "Howard's Trusts." (Upon the survivor's death, the balance of the marital trusts, if any, would be transferred to the decedent's trust.) The survivor's trust was Maxine's; we will refer to it as the "Survivor's Trust."

After Howard's death, Maxine took several steps. She attempted to exercise the limited power of appointment over Howard's Trusts by executing a written acknowledged instrument and delivering it to the trustee. The instrument purported to leave all of the property in Howard's Trusts to Cynthia, Maxine's grandchildren, and other relatives to the exclusion of Mark and his children. (The record does not contain the acknowledged instrument, so we do not know its entire contents or date of execution.) Maxine also amended the Survivor's Trust, appointing Cynthia as her successor trustee and leaving specific gifts of $200,000 to Mark and $100,000 to each of his children.

Howard's Trusts are governed by a no contest clause, executed by Howard and Maxine on March 8, 1988, which states: "In the event that any beneficiary under this instrument shall, singly or in conjunction with any other person or persons, contest in any court the validity of this trust or shall seek to obtain an adjudication in any proceeding in any court that this trust or any of its provisions is *void,* or seek otherwise to *void, nullify or set aside this trust or any of its provisions,* then the right of that person to take any interest which is given to him or her by this instrument shall be determined as it would have been determined if he or she had predeceased the execution of this instrument without surviving issue." (Italics added.)

The Survivor's Trust contains a no contest clause added by Maxine on October 3, 2003, seven years after Howard's death. It provides: "If any

beneficiary under this Trust shall, singly or in conjunction with any other person or persons, initiate or support a *Contest*, directly or indirectly (whether or not it is pursued to its completion), then the right of that person to take any interest which is given to him or her by this Trust shall be determined as though he or she had predeceased the execution of this Trust without surviving descendants." (Italics added.) "Contest" includes "[c]ontesting the *validity* of any of [*Maxine's*] *Estate Planning Documents*" or "[s]eeking to obtain an adjudication that any part of [*Maxine's*] *Estate Planning Documents* is *void* or seeking otherwise to *void, nullify or set aside any part of* [*Maxine's*] *Estate Planning Documents*." (Italics added.) "Estate Planning Documents" refers to any will, codicil or trust executed by Maxine as well as any other document she executed affecting the disposition of her assets after her death. It also refers to "[a]ny document executed by [Maxine] which exercises a power of appointment vested in [her]."

After Maxine died on November 9, 2003, no will or codicil purporting to be hers was filed for probate within 60 days.

On October 8, 2004, Mark filed an application for declaratory relief in the trial court under section 21320. That statute provides: "If an instrument containing a no contest clause is or has become irrevocable, a beneficiary may apply to the court for a determination of whether a particular motion, petition, or other act by the beneficiary . . . would be a contest within the terms of the no contest clause." (*Id.*, subd. (a).)

"[Mark's] position was that if Maxine did not 'exercise her power of appointment over Howard's Trusts through her Will or Codicil,' Mark was entitled to receive $200,000 and his children $100,000 each under [Howard's Trusts]. This would be in addition to the $200,000 given to him and the $100,000 each given to his children [by Maxine] under . . . the Survivor's Trust. He sought interpretation of 'the inconsistent language [in the limited power of appointment] . . .—one sentence allowing the power of appointment to be exercised by written instrument delivered to the Trustee during the survivor's lifetime, and the other sentence providing a *conclusive presumption* that the power was not exercised unless exercised in the survivor's Will or Codicil filed for probate within sixty (60) days following the survivor's death.' He therefore sought a declaration that his 'proposed [action] to interpret [the] clause granting [the limited] power of appointment' would not violate the no contest clause of either [Howard's Trusts] or the Survivor's Trust." (*Simon, supra,* B181504.)

Mark's proposed action sought various determinations by the probate court, specifically: " '1. The Court interpret . . . The Olesky Family Trust— 1983 such that the conclusive presumption set forth therein may not be

controverted by contrary evidence; [¶] 2. The Court determine that, because no Will or Codicil of Maxine was filed for probate within sixty (60) days of her death, Maxine's limited power of appointment . . . was not effectively exercised; [and] [¶] 3. The Court determine that, because Maxine is conclusively presumed to have not exercised the limited power of appointment . . . , [Mark] is entitled to receive the sum of Two Hundred Thousand Dollars ($200,000) from Howard's Trusts . . . and that each of [Mark's] two children is entitled to receive the sum of One Hundred Thousand Dollars ($100,000) from Howard's Trusts.' The probate court found that the proposed [action] would not violate the no contest clause of either [Howard's Trusts] or the Survivor's Trust." (*Simon, supra*, B181504.)

Cynthia filed an appeal. We affirmed (*Simon, supra*, B181504). Thus, under Mark's interpretation of the disputed language, he and his two children are collectively entitled to $400,000 under Howard's Trusts and to $400,000 under the Survivor's Trust.

On March 6, 2007, in response to Mark's application and our decision, Cynthia filed her own application under section 21320. Cynthia sought a determination that she would not violate the no contest clause in Howard's or the Survivor's Trusts by requesting that the trial court reform the language of the limited power of appointment so that an acknowledged instrument would be effective as long as it was filed *with the trustee* within 60 days of Maxine's death. In short, Cynthia wanted the conclusive presumption provision for the limited power of appointment to read like the comparable provision for the general power of appointment. To that end, she requested that the trial court insert the additional language found in the conclusive presumption provision for the general power of appointment—"and if no written, acknowledged instrument is filed with the Trustee prior to the end of such period"—into the conclusive presumption provision for the limited power of appointment.

In the alternative, Cynthia requested that the trial court excuse compliance with the filing of a will or codicil within 60 days of Maxine's death and thereby validate the exercise of the limited power of appointment through an acknowledged instrument delivered to the trustee. That request was based on section 631, subdivision (a), which permits a trial court to excuse compliance with the formal requirements of exercising a power of appointment if certain conditions are satisfied.

Cynthia relied in part on extrinsic evidence. The estate planning attorney for Howard and Maxine stated in a declaration that the conflict between the sentence establishing the three methods of exercising the power of appointment and the sentence containing the conclusive presumption was, in essence,

a scrivener's error. The attorney explained that Howard and Maxine initially did not want to leave any gift for Mark; Howard did not feel that Mark was "his son"; Howard was worried that Mark would attack his estate plan after he died; and Howard's main concern was the well-being of Maxine and Cynthia. According to the attorney, Howard and Maxine eventually decided, after consultation with counsel, that if they left a gift for Mark, it would serve as a disincentive for him to challenge the estate plan in light of the no contest clause; Howard decided to leave $200,000 to Mark and $100,000 to each of Mark's two children. The attorney's declaration further stated that, after Howard's death, the changes made in Maxine's estate planning documents were intended to maintain the same gifts for Mark and his children, not increase them.

Other evidence indicated that Maxine's will expressly stated that no power of appointment was intended to be exercised therein. Also, substantially all of Maxine's assets were held in the Survivor's Trust. Maxine believed she had exercised her limited power of appointment over Howard's Trusts by an acknowledged instrument delivered to the trustee. Consequently, there was no reason to file a will or codicil.

In opposition to Cynthia's application, Mark argued that her effort to "reform" the language of the conclusive presumption provision would violate the no contest clause in Howard's and the Survivor's Trusts because it would void, nullify, or set aside the conclusive presumption created by Maxine's failure to comply with the 60-day filing deadline for a will or codicil. Further, he asserted that the *reformation* of a trust to correct a scrivener's error, as opposed to the *interpretation* of a trust, was a contest per se: Cynthia's proposed reformation of the disputed language would "invalidate" the conclusive presumption based on an alleged "mistake" in drafting. That, Mark argued, would be nothing short of rewriting Howard's Trusts. In Mark's view, the provision containing the conclusive presumption was unambiguous.

By order dated June 4, 2007, the trial court ruled that Cynthia's proposed actions would not violate the no contest clauses. The order recited: "It would not be a contest of either [Howard's Trusts] or the Survivor's Trust for Cynthia Giammarrusco [to seek] to either modify [Howard's Trusts] . . . or in the alternative to request relief from the formal requirements of filing Maxine Olesky's will or codicil, and thereby deem the limited power of appointment validly exercised by Maxine." Mark appealed.

## II

## DISCUSSION

In reviewing the trial court's order that a beneficiary's proposed action will not violate a no contest clause, we apply a de novo standard of review. (*Betts v. City National Bank* (2007) 156 Cal.App.4th 222, 231 [67 Cal.Rptr.3d 152].)

■ "Under section 21320, 'a beneficiary may, without violating a no contest clause, apply to the court for a determination whether a particular act would be a contest provided that no determination of the merits of the petition is required.' . . . ' "[S]ection 21320 provides . . . a 'safe harbor' for beneficiaries who seek an advance judicial determination of whether a proposed legal challenge would be a contest [under a particular no contest clause]." ' . . . If a court determines that a . . . proposed action would constitute a contest, the beneficiary will then be able to make an informed decision whether to pursue the contest and forfeit his or her rights under a will *or* to forgo that contest and accede to the [trust's] provisions.' " (*Betts v. City National Bank, supra,* 156 Cal.App.4th at p. 232, citation & fn. omitted.)

"A ruling on whether the beneficiary's proposed action would be a . . . contest may not involve a determination on the merits of the action itself. . . . This makes sense. Otherwise, the summary procedure [provided by section 21320] could be used to allow the very form of challenge and protracted litigation the [trustor] sought to prevent." (*Estate of Ferber* (1998) 66 Cal.App.4th 244, 251 [77 Cal.Rptr.2d 774], citation omitted; accord, *Estate of Davies* (2005) 127 Cal.App.4th 1164, 1173 [26 Cal.Rptr.3d 239] (*Davies*); *Estate of Kaila* (2001) 94 Cal.App.4th 1122, 1135–1137 [114 Cal.Rptr.2d 865].)

### A. *No Contest Clauses*

■ "An in terrorem or no contest clause in a will or trust instrument creates a condition upon gifts and dispositions provided therein. . . . [A] no contest clause conditions a beneficiary's right to take the share provided to that beneficiary under such an instrument upon the beneficiary's agreement to acquiesce to the terms of the instrument. . . .

"No contest clauses are valid in California and are favored by the public policies of discouraging litigation and giving effect to the purposes expressed by the [trustor]. . . . Because a no contest clause results in a forfeiture, however, a court is required to strictly construe it and may not extend it beyond what was *plainly* the [trustor's] intent. . . .

■ " 'Whether there has been a "contest" within the meaning of a particular no-contest clause depends upon the circumstances of the particular case and the language used.' . . . '[T]he answer cannot be sought in a vacuum, but must be gleaned from a consideration of the purposes that the [trustor] sought to attain by the provisions of [his] [trust].' . . . Therefore, even though a no contest clause is strictly construed to avoid forfeiture, it is the [trustor's] intentions that control, and a court 'must not rewrite the . . . [trust] in such a way as to immunize legal proceedings plainly intended to frustrate [the trustor's] *unequivocally expressed* intent from the reach of the no-contest clause.' " (*Burch v. George* (1994) 7 Cal.4th 246, 254–255 [27 Cal.Rptr.2d 165, 866 P.2d 92], citations & fn. omitted, italics added.)

In determining whether a no contest clause would be violated, the courts consider the language of the clause, other terms of the trust, and extrinsic evidence of the trustor's intent, which may include the testimony of the attorney who drafted the estate plan. (See *Burch v. George, supra*, 7 Cal.4th at pp. 256–260; *Estate of Kaila, supra*, 94 Cal.App.4th at pp. 1130–1135; *Davies, supra*, 127 Cal.App.4th at p. 1174.) In general, if the beneficiary's proposed action would "effectively nullify or thwart [a] provision[] in the trust instrument" or "result in the nullification of [the trustor's] *clearly stated* intent," the proposal "would constitute a contest within the meaning of the no contest clause." (*Burch v. George, supra*, 7 Cal.4th at pp. 261, 263, italics added.)

The no contest clause in Howard's Trusts precludes a challenge to the "validity" of the trusts or an attempt to "void, nullify or set aside . . . any of [their] provisions." The no contest clause in the Survivor's Trust—made expressly applicable to any "document executed by [Maxine] which exercises a power of appointment"—contains the same language.

For simplicity, we sometimes use "nullify" to include words of similar import, such as "invalidate," "void," "set aside," "thwart," and "frustrate."

## B. *Cynthia's Proposed Action*

The provision in Howard's Trusts establishing *three* methods of exercising the limited power of appointment is ambiguous. It is immediately followed by language creating a conclusive presumption that one of the methods—an acknowledged instrument delivered to the trustee—is ineffective if a filing deadline is not satisfied with respect to the *other two* methods—a will or codicil.

In pursuing *his* application for declaratory relief in the trial court under section 21320, Mark admitted that these provisions were "inconsistent" and

"conflicting." We agreed in affirming the order granting his application. (*Simon, supra*, B181504.) But now Mark maintains that the provisions are unambiguous. He cannot have it both ways. The methods of exercising the limited power of appointment and the conclusive presumption provision could not be contradictory and conflicting for purposes of Mark's application but unambiguous when Cynthia applies for declaratory relief. In lay terms, what is good for the gander is good for the goose.

Cynthia argues that if the conclusive presumption applies to the "acknowledged instrument" method, then that method would be rendered surplusage—a "trap" for the survivor. She posits that Howard and Maxine could not have intended to authorize a specific method of exercising the limited power of appointment, only to take it away in the very next sentence.

Given the ambiguity between (1) the provision establishing three methods of exercising the limited power of appointment and (2) the conclusive presumption provision, we cannot say that Cynthia's proposed action would nullify Howard's Trusts or attempt to nullify any of the trusts' provisions. Here, the trustors' intent is not so "clearly" or "unequivocally expressed" that it would be frustrated by the beneficiary's proposed action. Cynthia may offer extrinsic evidence of their intent, and Mark does not contend otherwise. She may be able to convince the trial court that Howard and Maxine had no reason to use different conclusive presumptions for the limited and general powers of appointment. In that event, if the trial court reforms the conclusive presumption provision for the limited power of appointment—by inserting the additional language found in the conclusive presumption provision for the general power of appointment—no provision of the trusts would be nullified.

Mark offers several reasons to support the requirement that the survivor's will or codicil be filed within 60 days after death, such as determining whether *all* of the survivor's property is in the trust, aiding the trustee in the proper distribution of assets, and ensuring that a will or codicil has not superseded or modified a *prior* exercise of appointment made through an acknowledged instrument delivered to the trustee. Nevertheless, these are reasons that go to the merits of the parties' dispute and should be saved for trial. (See *Estate of Ferber, supra*, 66 Cal.App.4th at p. 251; *Davies, supra*, 127 Cal.App.4th at p. 1173; *Estate of Kaila, supra*, 94 Cal.App.4th at pp. 1135–1137.)

■ In sum, Cynthia's contention that the ambiguous language is the result of a scrivener's error and that the error should therefore be remedied in accordance with the grantors' intent does not violate the no contest clauses in the trusts.

## C. *Appropriate Remedies*

In his opening brief, Mark asserts that the reformation of a trust constitutes a contest because Cynthia is seeking to modify or change the language of the trust in response to a drafting mistake. But there is no such rule. The reformation of a trust's language does not necessarily frustrate the trustor's intent or seek to nullify a provision of the trust. It may, in fact, clarify an ambiguity or resolve a conflict within the document so as to state the trustor's intent more clearly or unequivocally. Similarly, under section 631, an interpretation excusing Cynthia from having to file a will or codicil—thereby giving effect to the "acknowledged instrument" method— would not run afoul of the no contest clauses given that Cynthia would have to prove (1) she *substantially complied* with the manner of appointment prescribed by the trusts and (2) the failure to comply with *all* of the pertinent formalities did not defeat a significant purpose of the trustors. In these circumstances, no provision of the trusts would be nullified.

### 1. *Reformation*

In her application for declaratory relief, Cynthia requested that the trial court reform the conflicting provisions of the limited power of appointment by inserting the following italicized language into the conclusive presumption provision: "If no Will or Codicil purporting to be that of the Survivor is filed for probate within sixty (60) days of his or her death, *and if no written, acknowledged instrument is filed with the Trustee prior to the end of such period*, it shall be conclusively presumed that the Survivor did not exercise this limited power of appointment." The conclusive presumption provision for the *limited* power of appointment would then read like the comparable provision governing the *general* power of appointment.

"If, due to a mistake, the trust does not contain the terms that were intended by the settlor, the settlor or other interested party may maintain a suit in equity to have the instrument *reformed* so that it will contain the terms that were actually agreed upon or that reflect the testator's actual intent. The more common type of . . . error, which may be made by the settlor or the scrivener, is a drafting error that is referred to as a mistake in expression." (Radford et al., The Law of Trusts and Trustees (3d ed. 2006) § 991, pp. 130–132, italics added, fns. omitted, followed in *Bilafer v. Bilafer* (2008) 161 Cal.App.4th 363, 370 [73 Cal.Rptr.3d 880]; see 161 Cal.App.4th at pp. 368–369.)

"Equity may intervene to correct a mistake in a trust whether it is an inter vivos trust or a testamentary trust, and may *reform* an inter vivos trust even after the settlor is dead. [But] the traditional presumption against reforming

mistakes in *wills* may present an additional challenge for a petitioner who seeks the reformation of a *testamentary trust*." (Radford et al., The Law of Trusts and Trustees, *supra*, § 991, pp. 133–134, fns. omitted, italics added & omitted.) Under California law, "*ambiguities* in names and descriptions [in a *will*] may be resolved by considering extrinsic evidence of decedent's intent [but] . . . [¶] . . . [t]here is older authority holding that drafting errors of *omission*"—omitting a beneficiary's name or a residuary clause—"may not be corrected by reformation; hence, extrinsic evidence of the testator's intent in drafting the [*will*] is inadmissible. The theory is that correction would require the addition of a new provision and courts may not add anything to a *will*." (Ross, Cal. Practice Guide: Probate (The Rutter Group 2008) ¶¶ 15:161.1 to 15:161.2, p. 15-48 (rev. # 1, 2007), citations omitted, italics added & omitted.) In light of more recent changes in the Probate Code, however, the continuing validity of the older cases is doubtful. (See *id.*, ¶ 15:161.5, p. 15-49 (rev. # 1, 2007), citing §§ 6111.5, 21102, subd. (c).)

Regardless of any distinctions made in the reformation of a will, they need not detain us. "At common law, a trial court had the equitable power to *reform* an irrevocable *trust* where a drafting error defeats the trustor's intentions. . . . [Case law] confirms that this authority remains today." (*Bilafer v. Bilafer, supra*, 161 Cal.App.4th at p. 369, citations omitted, italics added.)

In *Ike v. Doolittle* (1998) 61 Cal.App.4th 51 [70 Cal.Rptr.2d 887] (*Ike*), after the death of the trustors, the trial court addressed three ambiguities in a trust and a related property agreement. First, upon its creation, the trust was funded with the separate and community property of the trustors. The trust provided that the property would retain its separate or community nature. Yet, the same day the trust was executed, the trustors signed a separate property agreement that appeared to indicate they had agreed to transmute all of their separate property into community property. Second, the trust contained an intestacy clause with respect to any property not distributed through its other provisions but also named several beneficiaries of the trustors. In a subsequent amendment to the trust, the trustors retained the names of several beneficiaries but did not make clear whether the intestacy clause had been revoked. As a consequence of these two ambiguities, upon the survivor's death, the trustee could not determine whether the property should go to the beneficiaries named in the trust or to the heirs of the survivor, thereby giving rise to a third ambiguity. (See *id.* at pp. 59–67.) After considering extrinsic evidence, the trial court reformed the trust, changing its language in several respects, such that the property would be distributed to the named beneficiaries. (See *id.* at pp. 67–71.)

■ The Court of Appeal affirmed. As a preliminary matter, it independently concluded that the trust documents contained the same three ambiguities identified by the trial court. (See *Ike, supra*, 61 Cal.App.4th at pp. 74–75.) The Court of Appeal also commented: "An ambiguity in a written instrument exists when, in light of the circumstances surrounding the execution of the instrument, ' "the written language is fairly susceptible of two or more constructions." . . .' . . .

"Where a trust instrument contains some expression of the trustor's intention, but as a result of a drafting error that expression is made ambiguous, a trial court may admit and consider extrinsic evidence, including the drafter's testimony, to resolve the ambiguity and give effect to the trustor's intention as expressed in the trust instrument." (*Ike, supra*, 61 Cal.App.4th at p. 74, citation omitted.)

■ After reviewing the case law on the reformation of trusts, the court in *Ike* continued: "We reject [the] assertion that a trial court cannot modify a trust to remedy a drafting error. In California, the common law equitable power of a trial court to modify or reform a trust extends to situations where, as here, the trust instrument contains some expression of the trustor's intention, but a drafting error renders that expression ambiguous. . . . [¶] . . . [¶]

"We thus conclude the court below had equitable power, founded in common law . . . , to modify the Trust provided (1) a 'peculiar' or 'exceptional' circumstance made modification necessary to accomplish the purpose of the trustors, and (2) there was some expression in the trust instrument of the purpose of the trustors. We conclude that . . . a drafting error in a trust instrument which renders ambiguous an expression contained therein regarding the administrative or distributive intentions of the trustor(s) constitutes a 'peculiar' or 'exceptional' circumstance . . . which may justify an equitable modification of a trust instrument to accomplish the purpose of the trustor(s)." (*Ike, supra*, 61 Cal.App.4th at pp. 82–83, citation omitted.)

The court in *Ike* also rejected an argument Mark makes here, namely, sections 15400 to 15410, entitled "Modification and Termination of Trusts," do not permit the reformation of a trust due to a scrivener's error. Yet, as *Ike* points out: "Section 17200, subdivision (a), allows a trustee or beneficiary to 'petition the court . . . concerning the internal affairs of the trust . . . .' Subdivision (b) sets forth a nonexclusive list of examples of proceedings which 'concern[] the internal affairs of the trust' within the meaning of section 17200, subdivision (a). Among the examples relevant herein are (1) '[a]scertaining beneficiaries and determining to whom the property shall pass or be delivered upon final . . . termination of the trust, to the extent the determination is not made by the trust instrument' (§ 17200, subd. (b)(4)); and

(2) '[a]pproving or directing the modification . . . of the trust' (*id.,* subd. (b)(13)). We note these statutory provisions are broadly worded.

"It is true the 1990 Law Revision Commission comment to section 17200 states in part that '[a]s to modification . . . of trusts . . . , see Sections 15400–15410. . . .' . . . However, none of the provisions in these sections (§§ 15400–15410) state that these various provisions set forth the exclusive grounds for modification of a trust.

"Absent such an express statutory provision limiting the grounds for modification of a trust to those set forth in section 15400 et seq., we conclude the broader equitable power of trial courts to modify or reform a trust is preserved by operation of section 15002, which expressly provides: 'Except to the extent that the common law rules governing trusts are modified by statute, the common law as to trusts is the law of this state.' " (*Ike, supra,* 61 Cal.App.4th at p. 84, citation & fn. omitted; accord, *Bilafer v. Bilafer, supra,* 161 Cal.App.4th at pp. 368–369.)

Finally, *Ike* noted that a provision of the Civil Code provides the basis for reforming a trust: "In its statement of decision, the [trial] court reasoned that '[a] Declaration of Trust, like any other contract, may be reformed and revised under California Civil Code [section] 3399 to correct a drafting error which, if left intact, would conflict [with] the actual expressed intent of the contracting parties.' [¶] . . . [¶]

"Civil Code section 3399 provides: '*When contract may be revised.* When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value.'

■ "In *Getty v. Getty* (1986) 187 Cal.App.3d 1159, 1180 [232 Cal.Rptr. 603], the Court of Appeal . . . held that an intended trust beneficiary had standing to seek reformation of a trust agreement under Civil Code section 3399. In so holding, the *Getty* court noted that Civil Code section 3399 is a codification of the equitable action for reformation of a written instrument, and the sole purpose of the reformation doctrine is to correct a written instrument in order to effectuate a common intention of the parties which was incorrectly reduced to writing. . . . However, the *Getty* court also noted that a court cannot create a new agreement for the parties under a theory of reformation. . . .

"We thus conclude that Civil Code section 3399 recognizes the equitable common law power of a trial court to reform a trust agreement based on

mistake, but not to create a new trust agreement under the theory of reformation." (*Ike, supra*, 61 Cal.App.4th at p. 85, citations omitted; accord, 13 Witkin, Summary of Cal. Law (10th ed. 2005) Trusts, § 211, pp. 794–795 [discussing *Ike*]; 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 279, pp. 309–310 [Civ. Code, § 3399 permits reformation of trusts].) Here, Cynthia seeks to reform the limited power of appointment based on a drafting mistake and to implement the trustors' intent, not create a new agreement the trustors never considered or intended.

■ Nor does the reformation of a trust necessarily violate a no contest clause, as made clear in the Restatement Third of Property, which California courts often find persuasive. (See, e.g., *Villa De Las Palmas Homeowners Assn. v. Terifaj* (2004) 33 Cal.4th 73, 81, 84 [14 Cal.Rptr.3d 67, 90 P.3d 1223]; *Peak Investments v. South Peak Homeowners Assn., Inc.* (2006) 140 Cal.App.4th 1363, 1368 [44 Cal.Rptr.3d 892].) The Restatement provides: "A suit to construe, *reform*, or modify the language of a donative document is not a contest of the document and hence is not a violation of a no-contest clause, unless the construction, reformation, or modification advocated by the person bringing the suit would *invalidate* the donative document or any of its provisions . . . . A proceeding brought by a beneficiary for the purpose of resolving an *ambiguity*, or for *reforming* or modifying the document, valid under all possible constructions or *valid under the construction advocated by the beneficiary*, is not a contest . . . . In such a case, the beneficiary is seeking merely to determine and to protect the donor's intention and is not seeking to circumvent it . . . ." (Rest.3d Property, § 8.5, com. d, p. 198, italics added.) Cynthia's proposed action is based on an ambiguity in Howard's Trusts, and her construction of the conflicting language would not invalidate the trusts or any of their provisions but would implement the trustors' intention.

■ As the California Law Revision Commission has explained in discussing no contest clauses: "To effectuate the [trustor's] true intentions, it may be necessary to seek judicial construction of an *ambiguous* provision or the modification, *reformation*, or termination of an instrument that has become *incompatible* with the [trustor's] intentions. The need to determine the [trustor's] actual intentions may trump [his or her] desire to avoid litigation." (Recommendation: Revision of No Contest Clause Statute (Jan. 2008) 37 Cal. Law Revision Com. Rep. (2007) p. 377, italics added (hereafter No Contest Recommendation).) "A beneficiary should not be punished for bringing an action to ensure the proper interpretation, *reformation*, or administration of an estate plan. Such actions serve the public policy of facilitating the fair and efficient administration of estates and help to effectuate the [trustor's] intentions, which might otherwise be undone by *mistake, ambiguity*, or changed circumstances." (*Id.* at p. 395, italics added.)

 We disagree with the notion that the mere name of the remedy sought—modification, reformation, or interpretation—dictates whether a no contest clause would be violated. A no contest clause usually focuses on a beneficiary's attempt to invalidate the trust, to "void, nullify, or set aside" or "thwart" a provision therein, or to "frustrate" the trustor's intent. Such clauses do not, in general, bar particular remedies by appellation. Substance—the *effect* of the beneficiary's proposed action—not form, is controlling. (See Civ. Code, § 3528.) For instance, in *Redman-Tafoya v. Armijo* (Ct.App. 2005) 2006 NMCA 11 [138 N.M. 836, 126 P.3d 1200], a will contained conflicting property designations, with one lot to be sold by the personal representative and the other to remain the property of the testator's daughter. But, as the testator knew, part of the daughter's house rested on the lot to be sold. The personal representative resolved the problem by obtaining a variance from the city settling the encroachment issues—an infrequent remedy where testamentary provisions are in conflict. In separate litigation, the personal representative sought to disinherit the daughter under a no contest clause, alleging she resisted his efforts to resolve the property issue. The trial court agreed. The New Mexico Court of Appeals reversed, concluding that the daughter had sought to clarify an ambiguity in the will, not to "nullify" or "invalidate" any of its provisions. (*Id.*, 126 P.3d at pp. 1203–1204, 1209, 1211, 1213–1214.)

Mark's reliance on our decision in *Davies, supra*, 127 Cal.App.4th 1164, is misplaced. We did not hold there that the reformation of a trust is always, or typically, a contest. In *Davies*, the trustor amended the trust twice after he was placed under a conservatorship. The second amendment provided that if one of the beneficiaries, Douglas, died within 120 days of the trustor, his share was to be divided equally among the remaining beneficiaries. After the trustor died, a dispute arose as to whether Douglas had lived the requisite 120 days. Douglas's widow brought an application under section 21320, seeking a declaration that Douglas had satisfied the 120-day provision. She also sought to "reform" the same provision on the grounds that (1) the trust could not be amended after the first conservator was appointed and (2) Douglas had not received proper notice of a prior proceeding in which the probate court had confirmed the amendments in part. The no contest clause stated that it revoked the bequest to any beneficiary who "challenge[d] any amendment [to the trust] . . . or . . . contest[ed] the capacity of the trustor to amend the trust." (*Davies*, at p. 1169.) The trial court granted the widow's application in full.

We affirmed in part, agreeing that a determination of whether Douglas died within 120 days of the trustor was not a contest. That question, we said, "is an unequivocal acquiescence in the condition [the trustor] imposed on the bequest to Douglas and, as such, plainly *not* a challenge to the trust or either of its amendments." (*Davies, supra*, 127 Cal.App.4th at p. 1174.)

And we reversed in part. With respect to the widow's remaining contentions, we explained: "[One of the surviving beneficiaries] contends [the widow's] proposed challenges (1) to the notice given at the time the amendments were confirmed by the probate court, and (2) to the *validity* of the amendments on the ground that [the trustor] was the subject of a conservatorship at the time the first amendment was made, are tantamount to indirect attacks on the amendments. We agree.

"[The widow's] challenge to the *validity* of the order approving the first and second amendments on either of these grounds, if successful, would either (1) unravel [the trustor's] estate plan completely by *destroying the amendments in their entirety*, or (2) require a reformation of the second amendment to *delete* the 120 days survivorship clause which would, by definition, constitute a contest. . . . [A] 'contest' is not confined to a *direct* attack on a will or trust instrument, but may include a separate legal proceeding that would *thwart or nullify or unravel the testator's* expressed *wishes*." (*Davies, supra*, 127 Cal.App.4th at p. 1175, underscoring & some italics added, fn. omitted.)

Unlike the challenges in *Davies*, Cynthia's application for declaratory relief does not question the validity of the trusts or any of their provisions. Nor does she seek to destroy or delete any provisions. And if Cynthia prevails, she would not thwart, nullify, or unravel the trustors' *expressed* wishes. Indeed, the purpose of her application is to examine the ambiguous and conflicting provisions in Howard's Trusts so the trial court can *determine* and *implement* the trustors' wishes. In *Davies*, unlike the present case, there were no such provisions. The 120-day survivorship provision was clear and unambiguous, as were the other provisions of the trust. Consequently, reformation was not an appropriate remedy in that case. (See *Genger v. Delsol* (1997) 56 Cal.App.4th 1410, 1422 [66 Cal.Rptr.2d 527] [beneficiary's proposed pleading would constitute a contest because it would "completely unravel the decedent's estate plan by setting aside the core of the plan," would "nullify" certain provisions of the trust, and would "thwart" the decedent's expressed intent in two respects].)

Last, the parties debate the applicability of section 21305, subdivision (b)(11) (section 21305(b)(11)), which states that "[a] pleading regarding the reformation of an instrument to carry out the intention of the person creating the instrument" "do[es] not violate a no contest clause as a matter of public policy." But section 21305(b)(11) applies "only to instruments of decedents dying on or after January 1, 2003, and to documents that become irrevocable on or after January 1, 2003." (§ 21305, subd. (d).) Here, the ambiguous provisions appear in Howard's Trusts, both of which became irrevocable upon his death in October 1996. As a result, section 21305(b)(11)

does not apply. That the Survivor's Trust became irrevocable upon Maxine's death—after January 1, 2003—does not permit Cynthia to use the no contest clause in *that* trust to bootstrap section 21305(b)(11) into an analysis of the ambiguity in *Howard's* Trusts. Although the Survivor's Trust *is* subject to section 21305(b)(11), neither party seeks to reform any of its provisions.

### 2. Compliance with Conditions of the Power of Appointment

" ' "A fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' " (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743 [110 Cal.Rptr.2d 828, 28 P.3d 876].) " 'The statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs.' " (*Lonicki v. Sutter Health Central* (2008) 43 Cal.4th 201, 209 [74 Cal.Rptr.3d 570, 180 P.3d 321].) "If 'the terms of a statute provide no definitive answer, then courts may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history.' " (*Mercy Hospital & Medical Center v. Farmers Ins. Group of Companies* (1997) 15 Cal.4th 213, 219 [61 Cal.Rptr.2d 638, 932 P.2d 210].)

" '[T]he "plain meaning" rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose . . . .' " (*County of San Bernardino v. City of San Bernardino* (1997) 15 Cal.4th 909, 943 [64 Cal.Rptr.2d 814, 938 P.2d 876].) "[W]e ' "must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute . . . ." ' " (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003 [111 Cal.Rptr.2d 564, 30 P.3d 57].) " 'We examine the history and background of the statutory provision in order to ascertain the most reasonable interpretation of the measure.' " (*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 543 [67 Cal.Rptr.3d 330, 169 P.3d 559].) In addition to the statute's plain meaning, " 'legislative history provides additional authority' " in construing a statute. (*Id.* at p. 544.)

Enacted in 1969, former section 1385.1, subdivision (a) of the Civil Code provided: "[I]f the creating instrument specifies requirements' as to the manner, time, and conditions of the exercise of a power of appointment, the power can be exercised only by complying with those requirements." (Stats. 1969, ch. 155, § 1, pp. 402, 404.)

In *Estate of Wood* (1973) 32 Cal.App.3d 862 [108 Cal.Rptr. 522], the husband's will disposed of the spouses' community property and, as to the

residue of his estate, created "Trust A" and "Trust B." The wife was given a general power of appointment over Trust A as follows: " '[I]f my wife survives me, then she shall have the absolute power exercisable only by a written instrument other than a will *delivered to the Trustee during her lifetime* to appoint any part of the principal and any undistributed income of Trust "A" in favor of herself, her estate or any person.' " (*Id.* at p. 866, some italics omitted.) Further, if the wife did not exercise the power of appointment or failed to dispose of all the property in Trust A, then upon her death, the remaining assets in Trust A would be held and distributed to other, named beneficiaries as part of Trust B.

The husband died on May 27, 1967. On December 12, 1967, the wife filed with the trustee an instrument dividing her trust property into thirds, giving the assets to two groups of children and one individual. (*Estate of Wood, supra,* 32 Cal.App.3d at pp. 866–867.) Later, the wife filed with the trustee an instrument she signed on April 30, 1969, directing instead that her trust estate be divided into halves, with each half going to a named individual. Ultimately, on October 28, 1970, the wife signed an instrument revoking all prior exercises of the power of appointment and exercising that power in favor of Genevieve Knight. On November 3, 1970, the wife signed another instrument declaring that, pursuant to her power of appointment, she directed that, upon her death, the estate of Trust A be distributed to Genevieve Knight, " 'my companion.' " (*Id.* at p. 868.)

The wife died on November 22, 1970. The two 1970 instruments were not delivered to the trustee until December 28, 1970, despite the wife's telephone call to her attorney shortly after November 3, 1970, to make sure that "everything had been done to carry out the appointment to Mrs. Knight." (*Estate of Wood, supra,* 32 Cal.App.3d at p. 882; see *id.* at pp. 867, 882.) The attorney assured the wife that everything had been done.

The beneficiaries under the pre-1970 instruments brought suit, asserting various claims to the property in Trust A on the ground that the 1970 instruments were not delivered to the trustee before the wife's death. The trial court found that the 1970 appointment to Knight was effective.

The Court of Appeal affirmed. After quoting the restrictive language of former Civil Code section 1385.1, subdivision (a), the court explained: "No doubt one of the purposes to be served by the [trust] provision requiring the appointing instrument to be delivered to the trustee during the lifetime of the donee [wife] is that of assuring the authenticity of the document. Another purpose would be to insure that the donee, in addition to executing the appointing instrument, intended that it be delivered to the trustee during the lifetime of the donee. A third purpose might be for the protection of the

trustee, who, following the death of the donee, might otherwise distribute principal or income in ignorance of the existence of an attempted exercise of the power that had not been delivered to the trustee.

"None of those purposes will be thwarted in the present case by giving effect to the 1970 appointing instrument. Its authenticity has not been questioned; the donee did all it was possible for her to do to have it delivered to the trustee during her lifetime; and the trustee has not paid out to the claimants in default of the exercise of the power. [¶] . . . [¶]

"We doubt that the purpose of the conditions imposed by [the husband] upon the exercise of the power was to prevent a pattern of action by the donee of precisely the character she engaged in. Given the degree of control by the widow over the disposition of one-half of the community assets required to effect the tax consequences that were the evident purpose of the estate plan, the course of conduct she followed must be considered a reasonable compliance with the conditions imposed." (*Estate of Wood, supra,* 32 Cal.App.3d at pp. 883–884.)

 In light of the seeming conflict between former Civil Code section 1385.1 and *Estate of Wood, supra,* 32 Cal.App.3d 862, the California Law Revision Commission issued a recommendation entitled Relocation of Powers of Appointment Statute (Sept. 1991) 21 California Law Revision Commission Report (1991) page 91 (hereafter Relocation Recommendation). " 'Explanatory comments by a law revision commission are persuasive evidence of the intent of the Legislature in subsequently enacting its recommendations into law.' " (*Catch v. Phillips* (1999) 73 Cal.App.4th 648, 654 [86 Cal.Rptr.2d 584].)

The commission's report suggested that former Civil Code section 1385.1 be reenacted as Probate Code section 630 without substantive change. (Relocation Recommendation, 21 Cal. Law Revision Com. Rep., *supra,* com. to § 630, at p. 107.) That was done. (Stats. 1992, ch. 30, § 2, pp. 114, 116.)

The commission also proposed the addition of a new statute, section 631, which would read:

"(a) Where an appointment does not satisfy the formal requirements specified in the creating instrument as provided in subdivision (a) of Section 630, the court may excuse compliance with the formal requirements and determine that exercise of the appointment was effective if both of the following requirements are satisfied:

"(1) The appointment approximates the manner of appointment prescribed by the donor.

"(2) The failure to satisfy the formal requirements does not defeat the accomplishment of a significant purpose of the donor.

"(b) This section does not permit a court to excuse compliance with a specific reference requirement under Section 632." (Relocation Recommendation, 21 Cal. Law Revision Com. Rep., *supra*, at p. 108.) The Legislature enacted the proposed law. (Stats. 1992, ch. 30, § 2, pp. 114, 116.)

Probate Code section 632, in turn, continued former Civil Code section 1385.2 without substantive change, providing: "If the creating instrument expressly directs that a power of appointment be exercised by an instrument that makes a specific reference to the power or to the instrument that created the power, the power can be exercised only by an instrument containing the required reference." (See Relocation Recommendation, 21 Cal. Law Revision Com. Rep., *supra*, com. to § 632, at p. 109; Stats. 1992, ch. 30, § 2, pp. 114, 116.)

In explaining the need for section 631, the commission report stated: "The existing statute[, Civil Code section 1385.1,] provides that, if the instrument creating the power of appointment 'specifies requirements as to the manner, time, and conditions' of its exercise, the 'power can be exercised only by complying with those requirements.' However, case law has applied a more forgiving standard. In *Estate of Wood*[, *supra*, 32 Cal.App.3d 862], the court upheld [the] exercise of a power of appointment that did not strictly comply with the donor's requirement of delivery on the grounds there was substantial compliance and that no presumed purpose of the donor would be thwarted. The Restatement (Second) of Property (Donative Transfers) also provides for judicial relief from strict compliance with special requirements imposed by the donor on exercise of the power.

"The Commission recommends revision of the strict compliance rule to codify the general rule of *Estate of Wood*[, *supra*, 32 Cal.App.3d 862] and make the statute consistent with the Restatement rule. The Commission believes the proposed rule to be preferable, and the revision will eliminate the danger that persons reading the statute literally will be [misled]." (Relocation Recommendation, 21 Cal. Law Revision Com. Rep., *supra*, at p. 96, fns. omitted.)

Consistent with the explanation in the report, the commission's comment to proposed Probate Code section 631 stated: "Section 631 is new. Subdivision (a) is drawn from Section 18.3 of the Restatement (Second) of Property (Donative Transfers) (1986). . . . The general rule in subdivision (a) is consistent with *Estate of Wood*[, *supra*, 32 Cal.App.3d at pages 881 to 883].

"The formal requisites of an appointment described in subdivision (a) include both the formal requirements imposed by the donor that are

significant and those that are of minor importance. . . . Unless some significant purpose is accomplished by an additional formal requirement imposed by the donor, equitable relief from the rigid enforcement of the additional formality is available. The rule stated in this subdivision arose in the English courts of Chancery and is still expressed as a rule that 'equity will aid the defective execution of a power.' Restatement (Second) of Property (Donative Transfers) § 18.3 comment *a* (1986).

"Under subdivision (a), where the donor imposes formal requirements with respect to the instrument of appointment that exceed the requirements imposed by law for the instrument, the donor's purpose in imposing additional formal requirements must be determined. To the extent the failure to comply with the additional formal requirements will not undermine the accomplishment of a significant purpose, the court in applying equitable principles may save the appointment if the appointment approximates the formal requirements imposed by the donor. See Restatement (Second) of Property (Donative Transfers) § 18.3 comment *c* (1986)." (Relocation Recommendation, 21 Cal. Law Revision Com. Rep., *supra*, com. to § 631, at pp. 108–109, reprinted at 52 West's Ann. Prob. Code (2002 ed.) foll. § 631, p. 332, citation omitted, some italics added.)

In the present case, Mark does not dispute that Maxine exercised the limited power of appointment by way of (1) a written instrument (2) properly acknowledged and (3) delivered to the trustee. He relies on the conclusive presumption provision, which mentions only wills and codicils, to render Maxine's written acknowledged instrument ineffective. Cynthia seeks to prove (1) Maxine approximated, or substantially complied with, the requisite formalities for acknowledged instruments; and (2) the failure to file a will or codicil within 60 days after Maxine's death did not defeat any of Howard's significant goals.

There is no contention that the acknowledged instrument failed to refer expressly to the power of appointment in Howard's Trusts (see § 632) or that the formalities in dispute were required by law as opposed to the trustors' personal wishes (see *Crook v. Contreras* (2002) 95 Cal.App.4th 1194, 1202 [116 Cal.Rptr.2d 319]). If Cynthia shows that Maxine substantially complied with the formalities of Howard's Trusts in exercising the limited power of appointment and did not undermine a significant purpose related thereto, she has not attempted to nullify a provision of the trust or sought an outcome that would constitute a contest. Both the plain meaning and legislative history of section 631 compel this conclusion.

D. *The Future of No Contest Clauses*

We close on a cautionary note. The current statutory scheme governing no contest clauses has been criticized as too complex given its numerous statutory and common law exceptions, creating uncertainty as to the scope and application of such clauses. (See Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1264 (2007–2008 Reg. Sess.) as amended Mar. 24, 2008, p. 5 <http://www.leginfo.ca.gov/pub/07-08/bill/sen/sb_1251-1300/sb_1264_cfa_20080409_105817_sen_comm.html> [as of Mar. 12, 2009].) " 'That uncertainty leads to widespread use of declaratory relief to construe the application of no contest clauses, adding an additional layer of litigation that does nothing to resolve the substance of any underlying issues.' " (*Ibid.*) Further, a no contest clause can be used to shield fraud or undue influence from judicial review by deterring a beneficiary from challenging a gift to someone who procured it in an improper manner. (*Ibid.*)

 As a result of these problems, the Legislature undertook a wholesale revision of the pertinent statutes in 2008. Effective January 1, 2010, section 21320—which permits beneficiaries to obtain declaratory relief concerning whether a proposed action violates a no contest clause—will be repealed. (Stats. 2008, ch. 174, § 1.) So will sections 21300 to 21308, 21321, and 21322. (Stats. 2008, ch. 174, § 1.) A revised statutory scheme will apply to instruments that became irrevocable on or after January 1, 2001; the common law will apply to instruments that became irrevocable before that date. (Stats. 2008, ch. 174, § 2, adding §§ 21313, 21315, subd. (b).) (The statutory changes are also available at <http://www.leginfo.ca.gov/pub/07-08/bill/sen/sb_1251-1300/sb_1264_bill_20080722_chaptered.html> [as of Mar. 12, 2009].)

In general, under the revised law, a challenge will not be considered a contest, regardless of the language of the instrument, unless (1) the beneficiary alleges, without probable cause, a type of invalidity specified in the new sections; (2) a pleading challenges a transfer of property on the ground it was not the trustor's property at the time of the transfer, and "the no contest clause expressly provides for that application"; or (3) a creditor's claim is filed or prosecuted, and "the no contest clause expressly provides for that application." (Stats. 2008, ch. 174, § 2, adding §§ 21311, subd. (a)(1)–(3), 21314; see generally No Contest Recommendation, 37 Cal. Law Revision Com. Rep., *supra*, at pp. 363–399; Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1264 (2007–2008 Reg. Sess.) as amended Mar. 24, 2008, pp. 1–17.) If an instrument contains a no contest clause that is inconsistent with the revised law, the clause will be disregarded. (See Stats. 2008, ch. 174, § 2, adding § 21314.)

## III

## DISPOSITION

The order is affirmed.

Rothschild, J., and Bauer, J.,* concurred.

---

*Judge of the Orange Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.